STATE of Missouri, Respondent,

v.

Polly GUIDORZI, Appellant,

and

Polly GUIDORZI, Appellant,

v.

STATE of Missouri, Respondent.

Nos. 18762, 19259.

Missouri Court of Appeals,
Southern District,
Division Two.

Feb. 21, 1995.

Motion for Rehearing and/or Transfer to
Supreme Court Denied March 14, 1995.

Application to Transfer Denied
April 25, 1995.

Craig A. Johnston, Office of the State Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., John R. Watson, Asst. Atty. Gen., Jefferson City,

Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

PARRISH, Judge.

Polly Guidorzi (hereafter sometimes referred to as defendant) was convicted, following a jury trial, of conspiracy to commit murder in the first degree, §§ 565.020, RSMo Supp.1992, and 564.016 [1]; assault in the first degree, § 565.050.2; and armed criminal action, § 571.015.1. Following those convictions, defendant filed a motion for post-conviction relief pursuant to Rule 29.15. It was denied without an evidentiary hearing.

Defendant appeals the judgment in her criminal case (No. 18762) and the judgment denying her Rule 29.15 motion (No. 19259). The appeals were consolidated as required by Rule 29.15(*l*). This court affirms both judgments.

### No. 18762

Polly and Jim Guidorzi were married in 1991. Before the marriage, Jim named Polly beneficiary on a policy of insurance on his life. The face amount of the life insurance policy was "[a]round two hundred thousand dollars." Polly knew that she had been named beneficiary.

Mark Williams was Polly's foster son. He was about 18 years old when Polly and Jim were married. Mark was a drug addict and relatively undisciplined. He and Jim did not get along well. They fought on occasion. Mark moved from Polly's and Jim's home rather than follow Jim's household rules.

Jim and Polly lived in St. Louis County, but they were building a house near Pontiac, Missouri, in Ozark County. They kept a boat there—Jim enjoyed hunting and fishing. They went to Pontiac almost every weekend.

Mark testified that he told Polly he had nothing to live for and he wanted to kill himself. He was asked the following questions and gave the following answers about Polly's reaction to his statement:

Q. [By the special prosecuting attorney] And when you told your mom this, what was her response, Mark?

. . . . .

A. She just told me she couldn't live, you know, if I killed myself, she said she couldn't live with it.

Q. . . . Did she have a plan on what she might do to make things better?

A. Well, I was supposed to go to Florida with my friends, go to college down there and she told me she would pay my way down there and I said, "No" and she told me that about Jim having some insurance money and she told me that if she could find somebody to shoot him then her and I will have money.

Mark said he did not believe Polly at first; that he made no response. Later, he told Polly that he would shoot Jim. He testified that he planned the shooting with her "[l]ike three other times."

The shooting was to take place in Ozark County. Mark's version of the plan was that Polly would get one of Jim's guns; Mark knew Jim kept guns at the house in Pontiac. She gave Mark $100 to pay someone to bring him to Ozark County.

Polly gave Mark the $100 on Friday, December 4, 1992. He gave $50 to a friend, Paul Mattingly, who agreed to take him to Ozark County. He told Mattingly that he wanted to go to Ozark County "[t]o look at some weed." Mark explained that "weed" was marijuana.

Mark testified that Polly told him to leave St. Louis about 5:00 p.m.; that she would hide a gun behind a rock near the Pontiac house. When Mark and Mattingly got to Ozark County, they drove past the Guidorzi house. They parked alongside a gravel road that led away from the house. Mark looked for the gun. It was not where he expected to find it.

Mark went to the house and knocked on the door. Polly answered. She had been talking on the telephone. Mark entered the house and Polly continued her telephone conversation. After she completed her telephone conversation, Mark asked about the gun. Polly got a shotgun and two shells from another part of the house and gave them to Mark. He took the shotgun outside and test fired it.

---

1. References to statutes are to RSMo 1986 unless stated otherwise.

Polly told Mark that Jim would return in about an hour. Mark found a snowsuit and a pair of gloves at the house. He put them on, then left with the shotgun.

Mark put the gun behind a rock and returned to Mattingly's car. He told Mattingly that the man he came to see would not be home for another 20 minutes. Mark told Mattingly "to waste like 15 or 20 minutes." Mattingly drove away leaving Mark near the Guidorzi house.

There was a gate at the road that led to the house. Mark shut the gate so Jim would have to get out of his car and open it. He then went to the rock where he had left the gun. He hid, waiting for Jim to return.

Jim arrived about 10 minutes later. He got out of his car to open the gate. Mark pointed the gun toward Jim and fired. He did not know if Jim was hit. He ran. Jim ran after him shouting.

At first, Mark did not see Mattingly's vehicle. He put the gun behind a tree and covered it with leaves. He was sick and upset. Then he saw the vehicle and ran to it. Mark got in the vehicle and told Mattingly to "get the hell out of here." Mattingly drove back to St. Louis to Mark's apartment. Mark got out of the vehicle.

Mark Williams' shot struck Jim Guidorzi. After he opened the gate at his driveway and was walking back to his car, Jim saw a gun barrel pointed at him and saw the gun fire. He was struck in the side. He described the sensation, "It was like somebody punched me in the stomach." He did not recognize the person who shot him. All he observed was "his stature, his size." Jim described the assailant as medium build. He chased the assailant about 25 yards.

Jim went to his house. He beat on the door. Polly answered. He told her he had been shot. He entered the house and laid on the floor near the doorway. Polly called for help.

At trial Jim Guidorzi was asked what injuries he sustained. He explained, "I have a colostomy and I have two huge holes in my chest."

When Paul Mattingly and Mark were travelling to Pontiac, Mark talked about being a hit man; that a weapon would be waiting for him to use. Mattingly thought he was joking. After their return to St. Louis, Mattingly was concerned about what may have happened in Ozark County. He called the emergency 911 telephone number and reported that he thought his friend had killed his stepfather.

Defendant's first point on appeal is directed to the 911 call. A tape recording was made of the conversation. It was played to the jury and a transcript of the conversation was admitted in evidence, over the objection of defendant. Point I contends the trial court erred in overruling defendant's objection to the tape and permitting it to be played to the jury and in admitting the transcript in evidence. Defendant contends that this was hearsay and resulted in improper bolstering of Paul Mattingly's testimony.

■ In order to preserve an evidentiary issue in a jury trial for appellate review, an objection must be made when the evidence is sought to be introduced; that objection must be asserted as error in a motion for new trial; and the issue must be presented in the appeal brief. *State v. Moiser*, 738 S.W.2d 549, 562 (Mo.App.1987).

■ When the tape recording was played to the jury and the transcript was offered in evidence, defendant's trial attorney objected contending it was hearsay. However, the motion for new trial does not assert the trial court's denial of the objection as a basis for a new trial. The motion's only reference to objections made at trial states, "The Court erred in overruling definite objections or requests made by defendant during the trial, including specific objections to instructions."

An issue presented in a motion for new trial must identify the particular allegation of error about which a defendant complains. This may be done, with respect to an evidentiary question, by stating, generally, the issue that is raised. *See* Rule 29.11(d). However, "the evidence complained of must be substantially stated or identified, and the *reasons* why it is claimed to have been inad-

missible must be assigned, at least with sufficient particularity to inform the trial court of the merits of the assignment." *State v. Lord,* 286 S.W.2d 737, 740 (Mo.1956).

The allegation in the motion for new trial that the trial "[c]ourt erred in overruling definite objections" was not sufficient to preserve the question of admissibility of the tape-recorded statement and the transcript. It identified nothing for review by the trial court nor anything that could be carried forward in an appeal brief.

This court, nevertheless, has reviewed defendant's complaint regarding the admission in evidence of the tape recording and the transcript for plain error. *See* Rule 29.12(b). In plain error review, relief will be granted "only when there is a strong, clear showing that manifest injustice or a miscarriage of justice will result if relief is not given." *State v. Flynn,* 875 S.W.2d 931, 934 (Mo.App. 1994).

■ Paul Mattingly and Mark Williams testified at trial. The events reported in Mattingly's 911 telephone call were consistent with his testimony and with Mark Williams' testimony. The admission of the tape recording and the transcript produced neither manifest injustice nor miscarriage of justice. There was no plain error. Point I is denied.

Point II is also a claim of plain error. It contends the trial court erred in failing, *sua sponte,* to declare a mistrial when a rebuttal witness testified that defendant's reputation for honesty was not good. It further claims the trial court committed plain error in overruling defendant's objection to questions asked witness Donna Bartels on cross-examination. Ms. Bartels was asked whether she was aware of people in the community talking about defendant stealing a wedding ring belonging to Nancy Schlict and whether she had heard about defendant stealing money from people named Eubanks.

Defendant argues that the only facet of her character she injected in the trial was her reputation for truthfulness and veracity; that the state, in its rebuttal evidence, exceeded the scope of this inquiry. She further contends that the questions asked Ms. Bar-

tels were improper because they attempted to show that defendant had committed crimes other than those with which she was charged.

One of the witnesses defendant called during her case-in-chief was Norton Beelingston, an attorney who had represented her in lawsuits arising out of two automobile accidents. Mr. Beelingston testified that he represented defendant with respect to injuries she sustained in automobile accidents that occurred in October 1991 and June 1992. A settlement was reached with respect to the first accident—defendant settled her claim for $4,000, of which she realized approximately $2,000 after payment of medical and other expenses. No settlement was reached with respect to the second accident.

Defendant's attorney asked Mr. Beelingston what happened in the second case. He explained:

> Polly called me one day and wanted to talk to me and she didn't want to pursue that case any further and I asked her why and she had indicated she didn't think she was hurt and she didn't have a fracture and she didn't want me to pursue it and she didn't want to make a claim against her own insurance company on her medical payment claim for which she pays a premium and I told her, "I've got the x-ray report, it does show the fracture, it's been confirmed." I had spoken to her doctor about it, talked to the radiologist and the hospital. She was very adament [sic] she didn't feel she was hurt and I had her sign a release that I no longer represented her.

After defendant rested her case, the state presented rebuttal evidence. The state's first rebuttal witness was Linda Dunsmere. Ms. Dunsmere testified that she was acquainted with the Guidorzis; that she was acquainted with defendant's reputation in the community. Ms. Dunsmere was asked, "With regard to her reputation for being truthful and honest, could you tell the jury what that was?" She answered, "Wasn't good. We considered her untrustworthy." Ms. Dunsmere was then asked what defendant's reputation was for being peaceful and law abiding. She answered, "Not good."

On cross-examination, defendant's trial attorney asked Ms. Dunsmere whether she had overheard conversations disputing that opinion. She answered, "No, the word was when Polly come around everybody hide your purse."

■ "Evidence of good reputation as to traits of character inherent in the crime charged is relevant to show the improbability of defendant committing the crime and as substantive proof of innocence." *Frederick v. State*, 754 S.W.2d 934, 935 (Mo.App.1988). However, the state cannot introduce reputation or character evidence unless evidence is first presented by a defendant. *State v. Skinner*, 734 S.W.2d 877, 883 (Mo.App.1987). Further, evidence of a defendant's reputation for truthfulness alone does not put his or her character in issue. *State v. Manning*, 682 S.W.2d 127, 131 (Mo.App.1984). Evidence of a defendant's truthfulness injects only the issue of the defendant's credibility as a witness. *Id.*

■ Defendant called Norton Beelingston as her witness. Her only inquiry of Mr. Beelingston was directed to his representation of her in personal injury claims unrelated to the criminal charges. Mr. Beelingston testified that defendant instructed him not to pursue a claim for personal injury because she did not believe she was injured, notwithstanding that there was medical evidence to the contrary. This went beyond the issue of defendant's credibility; beyond the question of her reputation for truthfulness. Defendant obviously wanted the jury to believe she was an honest and moral person because she chose not to take money that, in her opinion, she was not entitled to receive. As such, defendant placed her character, as to honesty, in issue.

■ The state was entitled to rebut defendant's evidence of good reputation for honesty by introducing evidence of bad reputation for honesty. *State v. Winston*, 655 S.W.2d 602, 603–04 (Mo.App.1983). The trial court committed no error, plain or otherwise, by permitting the state to present evidence that defendant's reputation for being an honest person was bad.

After the state's rebuttal evidence, defendant was permitted to present surrebuttal. Defendant called Donna Bartels as a character witness. She testified that she had heard no conversations in the community about defendant's reputation for truthfulness and honesty nor about her reputation for being law abiding.

On cross-examination, Ms. Bartels was asked if she was aware of people in the community talking about defendant stealing a wedding ring belonging to Nancy Schlict. She answered, "I heard nothing about this until after the shooting." The special prosecuting attorney also asked, "Did you hear about her stealing money from the Eubanks?" She answered, "Nothing."

■ Testimony that a witness "has never heard anything against the character or reputation of a defendant is perhaps the most cogent evidence that the defendant's reputation is good." *State v. Moseley*, 705 S.W.2d 613, 616 (Mo.App.1986); *see also State v. Foster*, 665 S.W.2d 348, 354 (Mo.App.1984). In view of such testimony, the state had the right to cross-examine Ms. Bartels. *State v. Creason*, 847 S.W.2d 482, 486 (Mo.App.1993). That right was limited, however. The state was not entitled to question her about specific acts merely to show other crimes involving defendant. *Id.*

■ This court should not and does not presume the special prosecuting attorney acted in bad faith in posing questions to Ms. Bartels. *Id.* at 487; *State v. Thomas*, 526 S.W.2d 893, 896 (Mo.App.1975). Although reputation cannot be established by queries concerning specific acts, the state was entitled to test Ms. Bartels' credibility by asking about specific instances. *State v. Winston*, 655 S.W.2d at 604. The questions posed by the special prosecuting attorney did not transcend permissible limits of cross-examination of Donna Bartels. Point II is denied.

Defendant's third point is directed to seven parts of the state's closing argument. She claims the trial court erred in not, *sua sponte*, declaring a mistrial at the time of each statement. Defendant's trial attorney objected to only one of the arguments at trial. None were included in defendant's

motion for new trial. She asks for plain error review.

■ The plain error rule does not require review of every error that was not properly preserved. *State v. McMillin*, 783 S.W.2d 82, 98 (Mo. banc), *cert. denied*, 498 U.S. 881, 111 S.Ct. 225, 112 L.Ed.2d 179 (1990). "[P]lain error will seldom be found in unobjected closing argument." *State v. Kempker*, 824 S.W.2d 909, 911 (Mo. banc 1992). This court declines to grant plain error review of the parts of the state's arguments to which defendant's trial counsel did not object.

The part of the state's closing argument to which defendant's trial attorney objected involved the identity of the murder weapon as the gun defendant gave Mark the day of the shooting. The special prosecutor argued, "If I show you that all this happened and Polly was in possession of that murder weapon she better get up here and explain it." Defendant's trial attorney objected. The trial judge inquired as to the basis for the objection. Defendant's attorney responded, "The prosecutor's testimony as to any burden that's on the Defendant to explain anything." The objection was overruled.

Defendant contends on appeal that the trial court erred in overruling the objection "because [the state's argument] shifted the burden of proof." She contends this constitutes plain error.

Defendant testified in her own defense. On cross-examination she was asked if she had an explanation as to how the gun "became the assault weapon." She answered, "No."

A reasonable interpretation of the state's argument would be that defendant had the opportunity to contradict the state's evidence that she gave the shotgun to Mark the day of the shooting, but failed to do so; that she offered no alternative explanation, consistent with innocence, of the physical evidence against her.

■ After defendant testified, the state, in closing argument, was entitled to comment about her failure to provide other evidence in support of that testimony. *State v. Taylor*, 831 S.W.2d 266, 269–70 (Mo.App. 1992). "The State may argue an adverse inference from a defendant's failure to produce evidence which could be reasonably expected to be in the defendant's favor.... When the State argues such an inference, the burden of proof does not shift to the accused." *State v. Perry*, 820 S.W.2d 570, 574 (Mo.App.1991) (citations omitted.) Point III is denied.

Defendant's fourth point is directed to questions asked during cross-examination of one of her witnesses, Randall Durham. Durham was incarcerated in the Ozark County jail while Mark Williams was held there.

Defendant called Durham as a witness. Durham testified about statements Mark made to him and a statement he overheard Mark make in a telephone conversation. He was asked what statement Mark made. Durham answered, "He made to me that, he said that 'My Mom didn't do none of this, I know she didn't do any of it.'"

Durham was then asked if he overheard a telephone conversation that Mark had. He answered that he did. Durham was asked, "What was the substance of the conversation that you heard?" He answered, "He was telling another person that, 'Be quiet, not to say anything, we'll be okay, we can get this put off on my Mom.'"

On cross-examination the special prosecutor asked Durham, "What were you in the Ozark County Jail for?" He answered, "Rape and forcible burglary." Defendant's trial attorney objected requesting that the answer be stricken. The trial court granted the request, admonishing the jury, "Okay, the jury will be ordered to disregard the last question and answer."

■ In Point IV, defendant contends the trial court erred "in not *sua sponte* declaring a mistrial when the state intentionally elicited testimony in cross-examination that defense witness Randall Durham had been in jail for rape and forcible burglary." She contends this inquiry denied her a fair trial "in that it was impermissible for the state to attack Durham's credibility by showing that he had arrests or criminal charges not resulting in convictions for those offenses." Defendant acknowledges that no request for

mistrial was made to the trial court. She seeks plain error review.

Principles applicable to this issue were enunciated in *State v. White*, 782 S.W.2d 461 (Mo.App.1990).

> Counsel was granted the relief that he sought, thus nothing is preserved for review. *See State v. Mabry*, 602 S.W.2d 1, 2 (Mo.App.1980). If the more drastic remedy of a mistrial was warranted under the circumstances presented here, then it was up to defense counsel to request that relief. *Id.; See also State v. Ward*, 713 S.W.2d 273, 275 (Mo.App.1986). The adequacy of the corrective action taken by the court is assumed. *Id.*

*Id.* at 465. No error was committed. Point IV is denied.

Point V contends the trial court erred and abused its discretion in denying defendant's motion to suppress evidence. The motion to suppress evidence was filed the morning of the day trial commenced. It sought to suppress "[a]ll physical evidence in the possession of the State which the State allowed the defense the opportunity to view on Wednesday, February 17, 1993, between the hours of 7:00 p.m. and 10:00 p.m., the evening before trial was to begin."

Request for discovery, as permitted by Rule 25.03, was filed January 6, 1993, by defendant's trial attorney. On January 20, 1993, the state filed a written pleading denominated as a response to the request for discovery. The pleading states, "[T]he material and information requested may be inspected, obtained, tested, copied or photographed at the office of Special Prosecuting Attorney, 421 E. State, Mountain Grove, MO 65711 during the hours of 9:00 AM to 5:00 PM between Monday through Friday, upon counsel notifying said office a suitable date and time."

On January 28, 1993, defendant filed a motion seeking sanctions for the state's failure to comply with her request for discovery. Defendant's attorney reviewed the material the state made available the night before trial commenced. On the morning of the first day of trial, defendant filed a motion to suppress evidence. The relief defendant sought was suppression of the evidence her trial attorney saw for the first time the previous evening. The trial court denied the motion to suppress evidence.

The state's response to defendant's request for discovery did not comply with Rule 25.03. *See State v. Bradley*, 882 S.W.2d 302, 305–06 (Mo.App.1994). However, the remedy for the violation was within the discretion of the trial court. *State v. Kilgore*, 771 S.W.2d 57, 66 (Mo. banc), *cert. denied*, 493 U.S. 874, 110 S.Ct. 211, 107 L.Ed.2d 164 (1989).

Defendant sought, by her motion to suppress evidence, sanctions for the state's failure to comply with her previous request for discovery. As such, denial of that motion amounts to an abuse of discretion only if the admission of the evidence sought to be suppressed resulted in fundamental unfairness to the defendant or substantively altered the outcome of the case. *State v. Neil*, 869 S.W.2d 734, 738 (Mo. banc 1994).

Defendant does not suggest, nor does this court perceive, that the outcome of the trial would have been different had defendant's trial attorney received the information sought by discovery at an earlier time. There was no suggestion that defendant would have taken different steps to meet that evidence. Such a showing is required in order to find an abuse of discretion by the trial court. *Id.* Point V is denied.

### No. 19259

Following filing of the transcript in No. 18762, defendant filed a *pro se* Rule 29.15 motion. The motion alleged ineffective assistance of counsel; that defendant was not mentally competent to go to trial; and that Jim Guidorzi testified untruthfully at trial.

The *pro se* motion was filed August 23, 1993. On August 25, 1993, counsel was appointed to represent defendant. On October 25, 1993, the attorney filed an affidavit stating she had reviewed files of the court, the transcript in the underlying criminal case, and files in the Rule 29.15 proceeding and inquired of movant regarding any additional claims and facts not included in the *pro se* motion.

The affidavit proclaimed that the motion attorney was not aware of additional meritorious or colorable claims or facts that might be added in an amended motion and that the *pro se* motion included all claims that were then known to defendant or her. It requested "that the motion court take judicial notice of [defendant's] *pro se* motion, and its files in the criminal and postconviction cases, and consider the case as submitted on the pleadings."

The motion court entered written findings of fact and conclusions of law and judgment denying defendant's Rule 29.15 motion without an evidentiary hearing. Point VI is directed to the judgment denying the motion. It alleges that the motion court erred in denying defendant's Rule 29.15 motion by failing to inquire, *sua sponte*, as to whether defendant's appointed counsel abandoned defendant and why no amended motion was filed.

Defendant contends the concerns that produced *Luleff v. State*, 807 S.W.2d 495 (Mo. banc 1991), required independent inquiry by the motion court regarding motion counsel's failure to file an amended motion. She suggests the rationale in *State v. Hodges*, 829 S.W.2d 604 (Mo.App.1992), and in *Cameron v. State*, 863 S.W.2d 385 (Mo.App.1993), supports her contention that the trial court erred in not conducting an independent inquiry of defendant's appointed counsel and defendant regarding whether an amended motion should have been filed.

*Luleff* requires inquiry by the motion court about performance of post-conviction counsel when there is no record of any activity by that counsel. It states, "At such time as the motion court may proceed to rule a postconviction motion *and there is no record of any activity by counsel on movant's behalf,* the motion court shall make inquiry, *sua sponte,* regarding the performances of both movant and counsel." 807 S.W.2d at 498 (emphasis added). In this case the filing of the challenged affidavit provides a record of activity by the attorney appointed to represent defendant in her Rule 29.15 proceeding.

This case is unlike either *Hodges* or *Cameron.* In *Hodges* a supplemental *pro se* motion was not verified. In *Cameron* the rec-

ord did not reveal that appointed counsel sought to ascertain whether the *pro se* motion included all grounds known to the litigant.

 The statements in defendant's postconviction counsel's affidavit demonstrate that requirements of Rule 29.15(e) were met. The motion court was not required to make further inquiry before ruling on the issues presented. Point VI is denied.

### Dispositions of Appeals

The judgment of conviction in No. 18762 is affirmed. The judgment denying defendant's Rule 29.15 motion in No. 19259 is affirmed.

PREWITT and CROW, JJ., concur.