SANGAMON ASSOCIATES, LTD., Dale E. Fredericks, Appellants,

v.

The CARPENTER 1985 FAMILY PARTNERSHIP, LTD.; Carpenter–Vulquartz Redevelopment Corp., Golden Gate Building Company; Dupage Properties, Inc.; St. Francis Associates, L.P.; Fleishhacker Properties; Mortimer Fleishhacker; Theodore D. Carpenter; The Carpenter, 427 West 12th Family Partnership, Ltd., Broadway–Washington Associates, Respondents.

No. WD 61177.

Missouri Court of Appeals, Western District.

July 29, 2003.

Frederick H. Riesmeyer, II, Kansas City, for appellant.

Rhonda E. Smiley, Kansas City, for respondents.

Before ELLIS, C.J., LOWENSTEIN and ULRICH, JJ.

HAROLD L. LOWENSTEIN, Judge

Sangamon Associates, Ltd. and Dale Fredericks appeal from the trial court's judgment in favor of the defendants [1] on the claims raised in appellants' twenty-two count petition alleging a longstanding partnership dispute concerning the ownership of a piece of property and allegations of various torts relating to ownership and attempted sale of the property and on the court's granting of defendants' counter-

1. Eleven defendants were named in the petition. The defendant-respondents are partners in the ownership and management of the real estate in question. They, and their relation to the case, will be discussed in the Factual and Procedural History section.

claim for partition of the property.[2] Appellants allege error with respect to all but nine of the counts contained in their petition as well as the partition of property relating to the counterclaim. This appeal is dismissed for lack of final judgment.

### Factual and Procedural History

The events surrounding this case are rather complex and span several decades. In review of the lack of finality, only a brief recitation of facts will be given to provide a background of what has occurred. Generally, this case involves partnership disputes arising out of ownership and operation of certain real estate in Kansas City. The principal individuals involved are respondent Allan Carpenter[3] and appellant Dale Fredericks.

In 1985, Carpenter and his family identified property located in downtown Kansas City near the Bartle Hall Convention Center that they wanted to acquire and develop. This area is knows as Block 105. Carpenter acquired several individual parcels located on Block 105, including at least three tracts of land: (1) the "North Broadway Property" located at 1200–1208 Broadway, (2) the "Mid–Broadway Property" located at 1210–1216 Broadway, and (3) the property located at 427 W. 12th Street. This dispute concerns the first two properties, which are and have been operated as a surface parking lot.

Later that year, Carpenter met Fredericks and they entered into several partnerships that would own and manage the property for development purposes. Fredericks created Sangamon Associates, Ltd. ("Sangamon"), a family partnership. Carpenter also created a family partner-

ship, The Carpenter 1985 Family Partnership, Ltd. ("Carpenter 1985"). Carpenter 1985, Sangamon, and Edgar Carpenter, Allan Carpenter's brother, then formed Broadway–Washington Associates, Ltd. ("BWA") to own and manage the property. Carpenter 1985 was the managing partner of BWA and owned sixty-five percent. Sangamon was the President and Reserve Manager, owning twenty-five percent, and Edgar owned fifteen percent.

Carpenter–Vulquartz ("C–V"), a Missouri Redevelopment Corporation and an entity owned by the Carpenter family, was named Manager of Projects under the BWA partnership agreement.

Following the initial acquisition of the properties located in Block 105, several transfers and purchases were completed. By 1991, the North Broadway Property was owned ninety percent by Carpenter, through a company called Golden Gateway Building Co. ("Golden Gateway"), which was a California limited partnership (since dissolved), and ten percent by Fredericks, through an Individual Retirement Account, as tenants in common. The general partners of Golden Gateway were:

1. DuPage Properties, Inc. ("DuPage")—a dissolved Nevada corporation (Carpenter may have been the last-named director, president, secretary, and treasurer)
2. St. Francis Associates, L.P., ("St.Francis")—a California limited partnership
3. Fleishhacker Properties—a California general partnership

Mortimer Fleishhacker was the general partner of Fleishhacker Properties. The

---

2. As will be discussed in more detail below, the counterclaim contained two counts.

3. During the time that this case was pending in the trial court, Carpenter died and his wife

was substituted as a party. For purposes of this opinion, "Carpenter" refers to both he and his wife.

Mid–Broadway Property was owned by BWA.

By 1994, Fredericks and Carpenter began experiencing difficulties relating to their partnership. One of those difficulties, a major one, involved an offer by Merrill Surls to purchase the Block 105 properties. After negotiations, Surls decided not to pursue the purchase of the property. Carpenter, who had done most of the negotiations but with initial input by Fredericks, blamed Fredericks for the failed transaction and later sued Fredericks for $10 million in a California court. The general dispute between the parties related to the allocation of the potential proceeds of the sale. Fredericks alleges that Carpenter then made defamatory remarks about him, claiming that he had "killed the sale" because he did not abide by an allocation agreement. This information, Fredericks claimed, was relayed to John Carpenter, Carpenter's son, who then relayed to his wife, Angela, who was staff counsel at Lockheed Missiles & Space Co., a major client of Frederick's law firm. Fredericks claims that as a result of these remarks, he was forced to leave the firm. The California court entered summary judgment in favor of Fredericks in that case.

Subsequently, Fredericks and Sangamon[4] filed this action against the other eleven parties discussed above, including counts for breach of fiduciary duty (3 counts), breach of contract, conversion (2 counts), constructive trust (2 counts), civil conspiracy, defamation, tortuous interference with business relations, and also requesting a partnership accounting (3 counts), an injunction for production of books and records (2 counts), appointment of a receiver (3 counts), removal of managing general partner and Manager of Pro-

jects (2 counts), and removal of managing joint venture partner and manager. Carpenter filed a counterclaim requesting partition of the North Broadway Property. As Count II of the counterclaim, Carpenter, Carpenter 1985, Carpenter on behalf of The Marital Community of Allan R. Carpenter and Theodora Carpenter ("CMC"), and BWA requested a winding up of the BWA partnership.

A jury trial, on certain claims triable by jury, began in this case on August 1997. On September 2, 1997, at the close of plaintiffs' evidence, the trial court directed a verdict in favor of the defendants on the civil conspiracy, defamation, and tortuous interference claims. Trial on the remaining matters resumed in the summer of 1998 continuing through the spring of 1999. On January 14, 2000, the trial court entered an interlocutory judgment concerning Appellants' twenty-two count petition.

During 1999, the trial court also heard evidence concerning the Carpenter counterclaim for partition and entered an interlocutory order of partition and an order of sale. A public judicial sale of the North Broadway Property was conducted on June 17, 1999, and Carpenter was the highest bidder. Following the sale, Fredericks filed a motion to have the sale set aside. After hearing evidence on this motion, the trial court set aside the sale, finding that the price, $100,000, was grossly inadequate. Several years later, and after some settlement negotiations, Carpenter filed supplemental suggestions in support of final order of partition, in which he offered to unilaterally increase the original bid to $32.00 per square foot or a total of $1,051,916.80. On January 11, 2002, the trial court entered a final judgment of

---

4. Some of Sangamon's claims were derivative actions on behalf of BWA, the partnership that owned and managed the Mid–Broadway property.

partition in which he set aside the prior order setting aside the sale, and confirmed the 1999 sale with an increase in the purchase price, reflecting Carpenter's offer to increase the bid. At that time, the trial court also entered final judgment on Frederick and Sangamon's twenty-two count petition. This appeal follows.

### Jurisdiction

■ Before this court turns to the merits of the appeal, it must first determine whether jurisdiction is proper. *Lumbermens Mut. Cas. v. Thornton*, 36 S.W.3d 398, (Mo.App. 2000). While neither party originally raised the issue of jurisdiction, this court must do so *sua sponte. Id.* A judgment is final, and thus appealable, if it " 'resolves all issues in a case, leaving nothing for future determination.' " *Id.* (quoting *Gibson v. Brewer*, 952 S.W.2d 239, 244 (Mo. banc 1997)). If there is no final judgment, this court has no jurisdiction to entertain the appeal, and the appeal must be dismissed. *Id.*

The question of finality concerns the effective disposition of Count II of the defendant Carpenter's counterclaim. During the April 15, 1999 hearing in this case and after evidence had been heard, the trial court overruled the defendants' motion to reconsider their previous motion to amend the counterclaim. In response to that ruling, counsel for the defendants stated the following:

> With the ruling that you have issued today of denying the motion to reconsider our motion for leave to amend, to add those other claims, I think that the partnership and [Carpenter 1985] are prepared to dismiss the winding up count as your Honor indicated would be okay the last time we were together and as [counsel for plaintiffs] approved last time we were together. So I don't believe there would be any other matters to consider.

Later in hearing, the following discussion occurred on the winding up of the partnership account:

> [PLAINTIFFS' COUNSEL]: So you have on the record dismissed your count for winding up of Broadway Washington?
>
> [DEFENDANTS' COUNSEL]: For supervision of the winding up.
>
> [PLAINTIFFS' COUNSEL]: Obviously, we still have to wind up the partnership, and we still need to deal with the claims that have been submitted and as we all recognize, the partnership had authority to do that under the statute and under the partnership agreement. It was only asking for supervision because we thought it might be helpful, but it hasn't proved that way. So the partnership will be wound up and the claims will be resolved and then that part will be finished.
>
> I am assuming that some of the claims that there are going to be rulings on from plaintiffs' side here will also be considered in that winding up process.
>
> [DEFENDANTS' COUNSEL]: Right, because that involves the allegations that certain moneys were taken wrongfully from the partnership and need to be put back; certain charges have been asserted against the partnership that need to be in our opinion disallowed and to be a striking of the balance.
>
> THE COURT: That really—assuming that everything that the plaintiff says is true, just for a moment—
>
> [DEFENDANTS' COUNSEL]: Sounds good to me, Judge.
>
> THE COURT:—and these moneys—so that would be the procedure would be [sic] to put the money back, restore the money to the partnership and then that would be part of the partnership. Those

would be partnership assets to be wound during the winding up process.

[DEFENDANTS' COUNSEL]: Right.

THE COURT: Distributed.

[DEFENDANTS' COUNSEL]: Then distributed to the partners per their capital accounts.

. . . .

[PLAINTIFFS' COUNSEL]: And, of course, I think our dismissal has to be without prejudice.

[DEFENDANTS' COUNSEL]: Oh, gee.

THE COURT: It is without prejudice.

[PLAINTIFFS' COUNSEL]: And we don't know where we might end up with this, but we are going to give it a shot to see if we can stay out of Court and get things wound up with the guidance that will eventually come from your rulings on plaintiffs' claims and. . . .

THE COURT: You have an appeal in California. One of you has an appeal pending in California.

[PLAINTIFFS' COUNSEL]: Yes.

. . . .

[PLAINTIFFS' COUNSEL]: In other words, I wouldn't have time to be in here with the supervision of the winding up if by some chance we were successful out there. So a lot of reasons to dismiss.

THE COURT: Well, and if you are serious about those, you know, counterclaims, other counterclaims, that is reason enough to dismiss.

[PLAINTIFFS' COUNSEL]: Correct.

THE COURT: All right. Well, get that to me, and I'll sign it.[5] But then I'll go through this and—I've started it, and I'm going to continue on. I have actual-

ly—it is unbelievable the amount of transcript, . . . .

At a later hearing on December 21, the issue of dismissal came up once again.

[PLAINTIFFS' COUNSEL]: Your Honor, I see another problem, and that is where do we go from here? I mean, how do we get this partnership wound up? I mean, I think it needs to be—there needs to be a judicial order of dissolution or judicial order of winding up, something like that to get us through the next "X" months here; otherwise, we will be back in here on who knows what.

. . . .

[PLAINTIFFS' COUNSEL]: Well, we dismissed that claim for supervision of the winding up at the Court's invitation and plaintiff's invitation because the managing general partner has authority to do that under the partnership agreement. So there is no request for that based on the consent of all the parties. We understand the Court's guidance, and I think the partnership can be wound up to everybody's satisfaction, but that is not before the Court. If they haven't pled dissolution or winding up—

[DEFENDANTS' COUNSEL]: We did not include a count for winding up. That was in their counterclaim, that is correct.

THE COURT: And that has been dismissed.

[PLAINTIFFS' COUNSEL]: Yeah, and they told us it was okay to dismiss it.

■ While it may have been everyone's understanding that Count II (Petition for Winding Up of Partnership) of the counterclaim was to be dismissed, the trial court never issued a written order to do so. Thus, the question is whether a trial

---

**5.** It is not completely clear from the record whether the trial court was referring to an order of dismissal or other orders that were previously discussed in the transcript.

judge's statement on the record indicating that a claim had been dismissed, after evidence had already been presented on other claims, is sufficient for the purpose of finality to establish jurisdiction for appellate review. Following the introduction of evidence, "an action shall not be dismissed at the plaintiff's instance except upon order of the court...." Rule 67.02(b).[6] Furthermore, under Rule 74.02, "order" is defined as "[e]very direction of a court made or entered in writing and not included in a judgment[.]" (emphasis added). The provisions of 67.02 apply to the dismissal of counterclaims as well. Rule 67.04.

Neither party contends that a written order dismissing Count II was, in fact, ever entered.[7] Further, Appellants stated in their Suggestions in Support of Finality of Judgment that "since the dismissal of the Winding Up of Partnership claim came after evidentiary hearings evidence had been heard, the trial judge 'ordered' the dismissal." Appellants claim that the oral "order" was sufficient. Appellants cite *Mills v. Berry*, 395 S.W.2d 228, 231 (Mo. App.1965), in support of its assertion. In Mills, however, "no evidence of any kind was offered by plaintiff." *Id.* at 230. This case would not fall under the requirements of 67.02(b) that require an "order of the court" following the introduction of evidence.

While all parties and the trial court may have agreed that Count II was to be dismissed and acted accordingly, there was no valid dismissal of that count in this case. Appellants have provided no basis upon which to support their assertion that

an oral dismissal satisfies the requirements of Rule 67.02(b). This case does not necessarily present a timing issue, i.e., whether the dismissal occurred prior to the introduction of evidence. It concerns whether an oral order satisfies the rules. As noted above, Rule 74.02 requires that orders be in writing. Without such a writing, there is no valid order. Since there was no valid dismissal of Count II, there are matters left to be resolved and the judgment is not final. See Lumbermens Mutual Casualty, 36 S.W.3d at 401.

The appeal is dismissed. The court will allow an expedited appeal based on the pending briefs if the cause is made final and promptly refiled here.

All concur.

---

6. This is the version of the rule in effect prior to July 1, 2002. The current rule has been changed to include in 67.02(a) that the dismissal may occur without order of the court: (1) "[p]rior to the swearing of the jury panel for the voir dire examination, or (2)[I]n cases tried without a jury, prior to the introduction of evidence."

7. Upon request by this court, Appellants filed Suggestions in Support of Finality of Judgment. The issue of finality was also addressed at oral arguments.