**SANGAMON ASSOCIATES LTD., et al., Respondent,**

v.

**The CARPENTER 1985 FAMILY PARTNERSHIP LTD., et al., Appellant.**

**No. WD 69280.**

Missouri Court of Appeals,
Western District.

Feb. 24, 2009.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 31, 2009.

Application for Transfer Denied
May 5, 2009.

William Edward Reeves, Caruthersville, MO, for appellant.

Frederick Haase Riesmeyer, III, Kansas City, MO, for respondent.

Before JOSEPH M. ELLIS, P.J., and JJAMES SMART and ALOK AHUJA, JJ.

ALOK AHUJA, Judge.

This appeal involves individuals and entities which jointly own, directly or indirectly, certain real estate in downtown Kansas City. The parties have been embroiled in litigation concerning their respective rights and obligations for more than a decade, in Missouri and elsewhere. In 2003 and 2004, we observed in a closely related case that "[t]he events surrounding this case are rather complex and span several decades,"[1] and that "[t]he history, both factually and procedurally, underlying this appeal is vast."[2] Unfortunately, the intervening years make those observations only more apt today.

The present appeal, brought pursuant to § 512.020, RSMo, involves the trial court's judgment refusing to revoke its order appointing a receiver to take control of two pieces of jointly owned property. We reverse, based on our conclusion that in prior litigation the parties fully litigated, or could have litigated, all—or at least a significant portion of—the grounds now asserted to justify appointment of a receiver.

## I. Factual Background

The late Allan R. Carpenter and Dale E. Fredericks formed Broadway–Washington Associates ("BWA"), a limited partnership, in 1985. BWA's partners were The Carpenter 1985 Family Partnership, Ltd., a

---

1. *Sangamon Assocs., Ltd. v. Carpenter 1985 Family P'ship, Ltd.*, 112 S.W.3d 112, 113 (Mo. App. W.D.2003).

2. *Sangamon Assocs., Ltd. v. Carpenter 1985 Family P'ship, Ltd.*, No. WD63485, 2004 WL 2339944, at *1 (Mo.App. W.D. Oct.19, 2004), *opinion on transfer*, 165 S.W.3d 141 (Mo. banc 2005).

Missouri limited partnership formerly controlled by Carpenter, and Sangamon Associates, Ltd., a Missouri limited partnership controlled by Fredericks. The Carpenter 1985 Family Partnership, Ltd. is the managing general partner of BWA.

BWA owns a piece of property located at 1210 Broadway in downtown Kansas City, which the parties refer to as the "Mid–Broadway Property." Carpenter (or his successor(s) in interest) and Fredericks also own directly, as tenants in common, an adjoining piece of property, located at 1200 Broadway, known as the "North Broadway Property." Both properties are managed by BWA, and operated as surface parking lots.

For purposes of simplicity, unless the context requires otherwise we refer to Allan R. Carpenter, his widow Theodora Carpenter, and related individuals and entities collectively as "Carpenter," and to Dale Fredericks and related individuals and entities as "Sangamon."

Over the years, various disputes have arisen between the parties concerning the control and management of BWA, and the management and disposition of the North Broadway and Mid–Broadway Properties. This Court has issued opinions involving these disputes on at least two prior occasions. *Sangamon Assocs., Ltd. v. Carpenter 1985 Family P'ship, Ltd.,* No. WD63485, 2004 WL 2339944, at *1 (Mo. App. W.D. Oct.19, 2004); *Sangamon Assocs., Ltd. v. Carpenter 1985 Family P'ship, Ltd.,* 112 S.W.3d 112, 113 (Mo.App. W.D.2003). The Missouri Supreme Court has also addressed them. *See Sangamon Assocs., Ltd. v. Carpenter 1985 Family P'ship, Ltd.,* 165 S.W.3d 141 (Mo. banc 2005); *see also State ex rel. Broadway–Washington Assocs., Ltd. v. Manners,* 186 S.W.3d 272 (Mo. banc 2006) (involving Kansas City's attempt to condemn property owned by BWA). Because these prior opinions detail the history of the parties'

ongoing disputes, we discuss here only those facts necessary for resolution of the discrete issues presented by this appeal.

## A. *Sangamon I*

On March 22, 1996, Sangamon brought suit against Carpenter in Jackson County Circuit Court ("*Sangamon I*"). The Second Amended Petition in *Sangamon I* alleges twenty-two direct and derivative claims for appointment of a receiver, an accounting, a mandatory injunction for production of books and records, removal of managing general partner, constructive trust, breach of fiduciary duty, breach of contract, conversion, civil conspiracy, defamation, and tortious interference with business relations, relating to both the North Broadway and Mid–Broadway Properties. *Sangamon I* was assigned to Division One of the Jackson County Circuit Court.

Following trial, the circuit court entered a Final Judgment in *Sangamon I* on January 11, 2002, which rejected the bulk of Sangamon's claims. In particular, in the Final Judgment the court found, "after a thorough review of the financial records and accounts of [BWA], that no monies are presently due to Sangamon Associates, Ltd. from [BWA]." The Court did, however, enter a money judgment for Dale Fredericks individually in connection with his claim for an accounting relating to revenues generated by the North Broadway Property (the property then owned directly by Fredericks and Carpenter as tenants in common). The Court also rejected claims seeking the appointment of a receiver both with respect to BWA, and with respect to the North Broadway Property.

Carpenter had filed a counterclaim in *Sangamon I* seeking partition of the North Broadway Property. The circuit court ordered a partition sale to be conducted, at which Carpenter was the sole bidder. Sangamon moved to have the sale

set aside based on the alleged gross inadequacy of the price offered by Carpenter. Ultimately, the trial court confirmed the public sale, after Carpenter offered to increase his bid by a factor of ten.

Sangamon appealed. After a decision by this Court, *see* 2004 WL 2339944, the Missouri Supreme Court granted transfer. It rejected the bulk of Sangamon's arguments seeking reversal, including Sangamon's challenges to the judgment denying its breach of fiduciary duty, conversion, and constructive trust claims. Of significance here, the Supreme Court affirmed the circuit court's refusal to appoint a receiver:

> Sangamon argues that the trial court's denial of its request for the appointment of a receiver was against the weight of the evidence. It argues that this Court should appoint a receiver pursuant to Rule 68.02 to sell the property because a receiver is necessary to protect the jointly-owned property. Sangamon alleges that Carpenter engaged in several instances of misconduct while acting as managing partner, including "engaging in extensive self-dealing, excluding other general partners from partnership affairs, failing to disclose material partnership information, and secretly suing his own partnership to recover monies which were the subject of this underlying litigation."
>
> . . . .
>
> Sangamon does not state a sufficient basis to justify the appointment of a receiver. The record does not reflect that the appointment of a receiver was necessary, and the trial court exercised its discretion in denying the request for the appointment. This Court affirms the trial court's denial of Sangamon's request to appoint a receiver.

165 S.W.3d at 146.

As it pertained to the partition sale of the North Broadway Property, however, the Supreme Court reversed the circuit court's acceptance of Carpenter's upwardly revised bid, finding that, by accepting this revised offer, the court "essentially conducted a private sale of the property." *Id.* at 145. The Supreme Court set aside the deed in partition, and "remanded for further proceedings in accordance with the requirements of Rule 96 and chapter 528 and this Court's opinion." *Id.*

Following the Supreme Court's remand, on April 30, 2008, the circuit court approved the most recent judicial sale of the North Broadway Property, at which Carpenter was once again the successful bidder. Sangamon has separately appealed that judgment; its appeal is pending in this Court as No. WD69748.

### B. The Present Lawsuit ("*Sangamon II*")

On the same day the circuit court entered its Final Judgment in *Sangamon I* (January 11, 2002), Sangamon filed this lawsuit against Carpenter in Jackson County Circuit Court. We refer to this case as "*Sangamon II*." Despite being filed in the same circuit as *Sangamon I*, *Sangamon II* was assigned to a different division. Although it appears that some effort was made to consolidate the two cases, those efforts were unsuccessful, and the cases proceeded on parallel tracks in separate divisions of the circuit court.

*Sangamon II* involves two counts: Count I, seeking a dissolution of BWA, and Count II, seeking a dissolution of the tenancy in common relationship with respect to the North Broadway Property. In both Counts Sangamon prays for the appointment of a receiver pursuant to Rule 68.02.

Sangamon's Petition in *Sangamon II* leaves no doubt that its claims hinge on alleged wrongdoing by Carpenter dating back to well before the filing of the *Sangamon I* case. Thus, the Petition alleges

that, "[t]hroughout the 1990s the Carpenter interests, led by Allen [sic] R. Carpenter, have controlled the operation and income of both properties, the NORTH AND MID BROADWAY PROPERTIES, and in doing so have excluded Fredericks from information, participation in management and any benefits of ownership and partnership in these properties." ¶ 12; *see also id.* ¶ 15 (alleging that Carpenter "ha[s] controlled and continue[s] to control both [properties] since their acquisition in the mid 1980's and continue[s] to exclude plaintiffs Fredericks and Sangamon from any participation as partners or co-owners of the properties," and that Fredericks and Sangamon "have received no benefit from the ownership interests in these properties since the conflict between these parties began"). Although the partition of the North Broadway Property, which is jointly owned by Fredericks and Carpenter as tenants in common, had been—and continues to be—litigated in *Sangamon I,* Sangamon's Petition in this case also alleges that "there exists a situation where it is not reasonably practical to carry on the joint ownership of the NORTH BROADWAY PROPERTY and therefore there are grounds for both the appointment of a receiver and for the judicial dissolution of the tenancy in common between [Fredericks and Carpenter] and for a judicially supervised winding [up] of the affairs of the joint ownership of the NORTH BROADWAY PROPERTY." ¶ 27.

Sangamon's counsel acknowledged in the circuit court that *Sangamon II* was filed due to Sangamon's dissatisfaction with the results, and progress, of *Sangamon I:* "[W]e filed the second lawsuit because we hadn't gotten a ruling on our motion for receivership. We hadn't gotten our dissolution." "One of the arguments I made before the Supreme Court which I was unsuccessful in, my client is still a partner. He's still being abused. He's still getting no money. He can't get a divorce. He's got to get his divorce. . . ."

Sangamon's Suggestions in Support of its Motion for Appointment of Receiver, and the Declaration of Dale E. Fredericks supporting the Motion,[3] make clear that Sangamon's complaints involve events which began, or occurred, well before the Final Judgment entered in *Sangamon I* on January 11, 2002. Thus, in outlining the "facts supporting appointment of [a] receiver," Sangamon argued that,

At no time since 1985, at the inception of the parties' business relationship over the subject real estate, have the Carpenter defendants paid plaintiffs' herein their share of money earned and due from ownership and/or operation of the parking lot. Despite repeated requests for copies of business records, bank statements, statements of income received from parking lot operation and related expenses, and the like, the Carpenter defendants have refused to provide such information. . . . These properties have been generating income for over ten years. In addition to plaintiffs' not receiving one cent of this income, plaintiffs have not even received information concerning the income, expenses, or operation of the property.

. . . .

The Carpenter defendants continue to assert 100% ownership and control over all the parties' properties, and refuse to

3. Carpenter argues that Fredericks' Declaration was never admitted in evidence in the circuit court, and that it is accordingly not properly considered part of the record on appeal. Our review of the transcript of the January 16, 2007 hearing indicates that Sangamon's counsel offered the declaration, but the court made no ruling admitting it into evidence. On the view we take of the case, it is irrelevant whether Fredericks' Declaration was properly admitted or not.

produce financial records or account for their activities, and refuse to pay plaintiffs their share of the business's cash flow. This pattern of conduct has continued, unabated and without interruption, since 1995.

On January 16, 2007, the circuit court heard oral arguments on Sangamon's Motion for Appointment of Receiver. During argument, Sangamon's counsel argued that in dividing the proceeds of any sale of the properties, the court would have the opportunity to decide "whether it was proper to exclude from Mr. Fredericks all income for the last 15 plus years, and all of that will be subject of an accounting that can be done."

On April 20, 2007, the circuit court granted the motion and appointed Berry F. Laws III as receiver "to take charge of the Missouri limited partnership known as [BWA]," and "to take charge of certain real estate owned as tenancy-in-common by the parties herein." With respect to both BWA and the North Broadway Property, the receiver was charged with "preserving and protecting the business, business interests and properties" of the parties, and ordered "to wind up" the respective relationships. The court's order specifically grants to the receiver "the power and authority to sell the said tenancy-in-common [i.e., North Broadway] property."

On August 23, 2007, Carpenter filed its Motion to Revoke Order Appointing Receiver, which was denied by the circuit court on January 17, 2008. This interlocutory appeal followed.[4]

4. Carpenter filed an earlier Motion to Revoke Order Appointing Receiver, which was also denied. This Court dismissed Carpenters attempt to appeal the denial of the earlier motion because the circuit courts order was not denominated a judgment. No similar defect affects this appeal.

## II. Standard of Review

■ "As in any civil case, our review is governed by the standard of review established in *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976), and accordingly, we will affirm the trial court's judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." *State ex rel. Cravens v. Nixon,* 234 S.W.3d 442, 445 (Mo.App. W.D. 2007) (internal quotation marks omitted). "The power to appoint a receiver is within the sound discretion of the trial court. . . ." *Sangamon I,* 165 S.W.3d at 146.

## III. Analysis

Carpenter asserts three Points Relied On. In Point I, Carpenter argues that "[t]he trial court erred in refusing to revoke its appointment of the receiver because the initial appointment was barred by the doctrines of res judicata, collateral estoppel, and law of the case," given the refusal to appoint a receiver in *Sangamon I* based on what are asserted to be the same facts and arguments. Carpenter argues in Point II that the trial court's appointment of a receiver was erroneous under the substantive and procedural standards governing such an appointment. Finally, Point III argues that "the trial court was required to abate its proceedings" with respect to the North Broadway Property because of the pendency of *Sangamon I.*

Because we conclude that Sangamon failed to demonstrate facts justifying appointment of a receiver which were independent of the facts considered—or which

We also note that, prior to filing this appeal, Carpenter unsuccessfully sought a Writ of Prohibition from the Missouri Supreme Court. *See State ex rel. Carpenter v. Torrence,* No. SC88538 (Mo. banc May 30, 2007). No party argues that denial of Carpenter's writ petition affects our consideration of the merits of this appeal.

could have been considered—in *Sangamon I,* and seeks the same relief regarding the North Broadway Property which is at issue in *Sangamon I,* we reverse the circuit court's judgment refusing to revoke its earlier order appointing a receiver.

### A.

"The court-made doctrine of collateral estoppel—known by its modern term, issue preclusion—precludes re-litigation of an issue previously decided and incorporated into an earlier judgment." *Sexton v. Jenkins & Assocs., Inc.,* 152 S.W.3d 270, 273 (Mo. banc 2004). "The doctrine requires that the issue was fully and fairly litigated, that the issue was essential to the earlier judgment, and that the earlier judgment be final and binding on the party against whom it is asserted." *Id.* "Under the doctrine of issue preclusion, a party is barred from raising an issue in a subsequent proceeding if: (1) the issue decided in the prior proceeding was identical to the issue presented in the current action; (2) the prior judgment resulted in a judgment on the merits; (3) the party against whom issue preclusion is asserted was a party or in privity with the party in the prior proceeding; and (4) the party had a full and fair opportunity to litigate the issues in the prior proceeding." *Woods v. Mehlville Chrysler–Plymouth,* 198 S.W.3d 165, 168 (Mo.App. E.D.2006). "Specific findings on an issue are not required to preclude re-litigation of that issue on collateral estoppel principles." *Carr v. Holt,* 134 S.W.3d 647, 650 (Mo.App. E.D.2004). "An issue that has been unambiguously, necessarily and implicitly determined by a judgment cannot be litigated again." *Id.*

In contrast, res judicata, or *claim* preclusion, precludes relitigation not only of those issues on which the court in an earlier case was required to pronounce judgment, "'but to every point properly belonging to the subject matter of litigation and which the parties, exercising reasonable diligence, might have brought forward at the time.'" *Chesterfield Village, Inc. v. City of Chesterfield,* 64 S.W.3d 315, 318 (Mo. banc 2002) (quoting *King Gen. Contractors, Inc., v. Reorganized Church of Jesus Christ of Latter Day Saints,* 821 S.W.2d 495, 501 (Mo. banc 1991)); *see also Kesterson v. State Farm Fire & Cas. Co.,* 242 S.W.3d 712, 715–16 (Mo. banc 2008). "The critical distinction between collateral estoppel and res judicata is that the former operates only as to issues previously litigated but *not* as to matters *not* litigated in the prior action though such might properly have been determined." *King Gen. Contractors,* 821 S.W.2d at 500.

As Sangamon correctly notes, *res judicata* extends "'"only to the facts in issue as they existed at the time the judgment was rendered, and does not prevent a reexamination of the same questions between the same parties where in the interval the facts have changed or new facts have occurred which may alter the legal rights or relations of litigants."'" *Farrow v. Brown,* 873 S.W.2d 918, 921 (Mo.App. E.D.1994) (quoting *Elam v. City of St. Ann,* 784 S.W.2d 330, 334 (Mo.App. E.D. 1990)). However, the Supreme Court has cautioned that

> "[t]he mere change of facts subsequent to the rendition of a judgment does not necessarily affect the operation of such judgment under the doctrine of *res judicata.* ... However, where, after rendition of a judgment, subsequent events occur, creating a new legal situation or altering the legal rights or relations of the litigants, the judgment may thereby be precluded from operating as an estoppel. In such case, the earlier adjudication is not permitted to bar a new action to vindicate rights subsequently acquired. In this connection, it has been declared that a judgment is not *res judicata* as to rights which were not in

existence at the time of the rendition of the judgment."

*City of Hardin v. Norborne Land Drainage Dist. of Carroll County,* 360 Mo. 1112, 232 S.W.2d 921, 925–26 (1950) (citation omitted).

**B.**

Whether viewed under principles of *res judicata* or collateral estoppel, the question becomes whether Sangamon is seeking relief based on subsequent events, which have created a new legal situation or altered the legal rights or relations of the parties, or instead whether it seeks appointment of a receiver based on the same grounds considered—and rejected—in *Sangamon I.*

■ In determining whether Sangamon's request for appointment of a receiver is precluded here, we begin by noting that a final judgment was issued on an identical request in *Sangamon I.* Counts Five, Eleven and Sixteen of the Second Amended Petition in *Sangamon I* all requested the appointment of a receiver for BWA or the North Broadway Property. After trial, the circuit court found in favor of Carpenter and denied Sangamon's demand for a receiver. Although the Missouri Supreme Court noted on appeal that "Sangamon alleges that Carpenter engaged in several instances of misconduct while acting as managing partner, including 'engaging in extensive self-dealing, excluding other general partners from partnership affairs, [and] failing to disclose material partnership information,'" it found that "Sangamon does not state a sufficient basis to justify the appointment of a receiver." 165 S.W.3d at 146.

On appeal, Sangamon argues vehemently that its receivership claim in this case is distinct and different from the one litigated in *Sangamon I.* According to Sangamon, this case "is based on different wrongs which took place at a different time, produced different damages and provided [a] new and different basis for the appointment of a receiver" than in *Sangamon I.*

After carefully reviewing the record, however, we conclude that the trial court's judgment refusing to revoke the appointment of a receiver must be reversed based on the overlap between Sangamon's asserted justification for appointment of a receiver here, and the arguments it made, and lost, in *Sangamon I.* Although Sangamon's Petition, motion papers, and oral arguments made some reference to events occurring after the entry of final judgment in *Sangamon I,* the predominant focus of its arguments was on claims of misconduct by Carpenter which had been fully litigated in *Sangamon I.* While we acknowledge that Sangamon would not be precluded from re-asserting its claim for appointment of a receiver if that claim was based on new events which "creat[ed] a new legal situation or alter[ed] the legal rights or relations of the litigants," we cannot conclude on the existing record that the circuit court's appointment of a receiver in fact rested on such new facts, as opposed to the previously-litigated facts and claims on which Sangamon primarily relied. We are accordingly constrained to reverse the trial court's judgment, and remand for further proceedings consistent with this opinion.[5]

---

5. In concluding that the record does not support the contention that the receivership claims in *Sangamon I* and *Sangamon II* dealt with different circumstances, we have reviewed the record on appeal, and in particular those sources that Sangamon argues provide specific support for the circuit court's judgment, including Sangamon's Suggestions in Support of its Motion for Appointment of Receiver, the original and supplemental declarations of Dale Fredericks, and the transcript of the January 16, 2007 hearing.

Thus, although Sangamon argues here that it has not received its rightful share of the revenues generated by the North Broadway or Mid–Broadway Properties, that claim was addressed—at least as it existed prior to the entry of Final Judgment—in *Sangamon I*. In the earlier case the trial court found, "after a thorough review of the financial records and accounts of [BWA], that no monies are presently due to Sangamon ... from [BWA]." Although the court in *Sangamon I did* find that Fredericks individually was due certain funds generated by the operations of the North Broadway Property, it entered a money judgment which it determined fully compensated Fredericks, and specifically found that any such wrongful withholding of income (together with other alleged misdeeds) did *not* justify appointment of a receiver for that property. In light of the *Sangamon I* decision, it simply is not open to Sangamon to argue here, yet again, that appointment of a receiver is justified because it has been denied its rightful share of revenues generated by either property "since their acquisition in the mid 1980's," "throughout the 1990's," or "since the conflict between these parties began," or that the circuit court here could order an accounting to decide "whether it was proper to exclude from Mr. Fredericks all income for the last 15 plus years." Yet those are some of the primary allegations on which the circuit court's appointment of a receiver presumably depends.

The same could be said of Sangamon's allegations that Carpenter has excluded Sangamon from management of the properties, or has denied it information to which it was entitled. Once again, to the extent that conduct began prior to the *Sangamon I* judgment, it was considered by the court in *Sangamon I;* while the court ordered some equitable relief to Sangamon with respect to its access to books and records of BWA, it denied appointment of a receiver on this basis, even though it found an award of equitable relief to be warranted.

Another allegation on which Sangamon relied below is what it refers to as the "secret lawsuit." Sangamon's Petition in this case alleged that, "[o]n or about December 18, 2000, the Honorable Jay A. Daugherty confirmed that an entity controlled by defendant[ ] Carpenter 1985 Partnership ... was guilty of fraud and breach of fiduciary duties against [Sangamon] and [BWA] based on the secretly filed action [by Carpenter against BWA] and confession of judgment against [BWA]." But in *Sangamon I* the Supreme Court expressly considered whether this action justified appointment of a receiver, and thus its merits have been litigated also. *See* 165 S.W.3d at 146 ("Sangamon alleges that Carpenter engaged in several instances of misconduct while acting as managing partner, including ... secretly suing his own partnership to recover monies which were the subject of this underling litigation.").

Finally, while we find no *express* reference in the various *Sangamon I* decisions to Sangamon's claim that it was entitled to assume control of BWA on Allan Carpenter's death in November 2000, but has been prevented by Carpenter from doing so, Sangamon plainly *could have* raised this issue in *Sangamon I*, even if it was not actually litigated there.[6]

---

**6.** We note that Sangamon also argues that a receivership is justified based on the non-satisfaction of certain monetary relief entered in *Sangamon I*, and based on evidence it submitted to the trial court concerning certain payments apparently made by BWA in 2003 and 2004 to Carpenter and others. Nothing in the record permits us, however, to determine whether these allegations, considered with any other post-*Sangamon I* developments, could satisfy the standards for appointment of a receiver, or (equally importantly) that the trial court would have exercised its discretion to appoint a receiver based solely on such post-*Sangamon I* considerations.

■ The trial court's appointment of a receiver with respect to the North Broadway Property is troubling for a further reason. As noted above, Sangamon's Count II in this action sought a "judicial dissolution of the tenancy in common" between Fredericks and Carpenter with respect to the North Broadway Property. In its order, the court specifically stated that the receiver was granted "the power and authority to sell the said tenancy-in-common property." But in *Sangamon I,* the parties have litigated for years—and at all levels of the Missouri judiciary—the question whether the North Broadway Property should be the subject of a judicially supervised partition sale, and the manner in which such a sale should properly be conducted. As a general matter, " '[w]hen a court of competent jurisdiction becomes possessed of a case, its authority continues, subject only to the authority of a superior court, until the matter is finally and completely resolved; and no court of concurrent jurisdiction may interfere with its action.' " *Bellon Wrecking & Salvage Co. v. David Orf, Inc.,* 983 S.W.2d 541, 548 (Mo.App. E.D.1998) (citation omitted). At least with respect to the forced sale of the North Broadway Property due to the parties' inability to continue as tenants in common, the circuit court in this case should have deferred to the long-pending *Sangamon I* action, in which the identical relief was requested.

Sangamon has essentially conceded that its present receivership motion is based on the simple passage of time, and the continuation of conduct previously addressed in *Sangamon I.* After outlining the conduct which it alleged justified appointment of a receiver, Sangamon's motion papers in the circuit court acknowledged that "[t]his pattern of conduct has continued, unabated and without interruption, since 1995." Sangamon's counsel effectively acknowledged at oral argument on the motion for appointment of a receiver that the filing of

*Sangamon II* represented his client's effort to get a "second bite at the apple": counsel stated that "we filed the second lawsuit because we hadn't gotten a ruling on our motion for receivership" in *Sangamon I* (when, in actuality, the motion had been ruled, but *denied* ); counsel also acknowledged that he sought a "divorce" of the parties' relationship in *Sangamon II* because this was "[o]ne of the arguments I made before the Supreme Court which I was unsuccessful in."

Sangamon filed a Motion to Consolidate and supporting suggestions in this appeal, asking that the current appeal be consolidated with the appeal of the final judgment in *Sangamon I,* No. WD69748. That Motion was denied. In its papers on the Motion to Consolidate, Sangamon argued that "these two actions involve the same parties and the same real and personal property and common questions of fact," and that separate appeal of the rulings in the cases "runs the very serious risk of inconsistent rulings." We find some irony in the fact that, in its Motion to Consolidate, it is *Sangamon* which argued that "[t]his Court should not countenance any form of forum shopping or playing of one court against the other, and the inconsistent results that will inevitably lead to."

■ As the Supreme Court emphasized in *Sangamon I,* " 'a receiver should be appointed only when the court is satisfied that the appointment will promote the interests of one or both parties, that it will prevent manifest wrong, imminently impending, and that the injury resulting will not be greater than the injury sought to be averted.' " 165 S.W.3d at 146 (quoting *Lynch v. Lynch,* 277 S.W.2d 692, 694 (Mo. App.1955)). "The power to appoint a receiver is a delicate one which is reluctantly exercised by the courts." *Lynch,* 277 S.W.2d at 694. "[A]bsent threatened destruction or dissipation of the property, or

where there is no good cause to believe that benefit would result from the appointment of a receiver, then the court should decline to make such an appointment." *Id.* Given the standards governing such relief, and given the fact that the identical relief had been finally denied in an earlier proceeding on the very day this lawsuit was filed, it was incumbent on Sangamon to show, with particularity, that its request for appointment of a receiver in this case was not merely an exercise in forum-shopping or relitigation of matters previously decided, but was instead based on new developments which created a new legal situation or altered the legal rights or relations of the parties. The bare assertion that a course of supposedly wrongful actions by Carpenter had "continued, unabated and without interruption," since before the filing of *Sangamon I* does not meet this standard, without a showing that the legal situation has changed because, for example, the propriety of Carpenter's course of conduct is affected by intervening events and should be reexamined, or the continuing course of conduct is triggering, or at least threatening, new or different injuries which may bear on the discretionary determination whether to appoint a receiver.

■■■ " 'Public policy dictates that there be an end of litigation; that those who have contested an issue shall be bound by the result of the contest; and that matters once tried shall be considered forever settled as between the parties.' " *Sexton,* 152 S.W.3d at 274 (quoting *Baldwin v. Iowa State Traveling Men's Assoc.,* 283 U.S. 522, 525, 51 S.Ct. 517, 75 L.Ed. 1244 (1931)). Here, Sangamon did not demonstrate with particularity what new developments required the conclusion that appointment of a receiver was necessary pending the final disposition of its claims.

Given that in *Sangamon I* a court of law had already fully and finally determined that such a need did not exist with respect to the same business relationships, under what appear to be the same operative facts, Sangamon was required to do more than recite generalized grievances dating back a decade or more to justify the relief it sought.[7]

## IV.   Conclusion

We reverse the judgment of the circuit court and remand for further proceedings.

All concur.

---

**7.** Given the nature of this interlocutory appeal, we do not decide the preclusive effect of *Sangamon I* on issues other than the appointment of receiver.