

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | WD84521 |
| | ) | |
| JASON R. SHADE, | ) | Opinion filed: |
| | ) | December 20, 2022 |
| Appellant. | ) | |

## APPEAL FROM THE CIRCUIT COURT OF SULLIVAN COUNTY, MISSOURI
## THE HONORABLE TRACEY A. MASON-WHITE, JUDGE

Division One:  W. Douglas Thomson, Presiding Judge,
Alok Ahuja, Judge and Edward R. Ardini, Jr., Judge

Jason Shade ("Shade") appeals the judgment of the Circuit Court of Sullivan County convicting him, after a jury trial, of one count of first-degree sexual abuse and one count of second-degree sexual abuse. Shade raises four points on appeal, each asserting improper admission of evidence at trial. For the reasons stated below, we affirm.

### Factual and Procedural Background

Shade was charged with four sexual offenses. The charges involved two women who were in hospice care at Macon Health Care Center: M.S.—a 97-year-old woman with dementia and heart failure—and B.F.—a 72-year-old woman who had suffered a stroke. Count I charged Shade with first-degree rape of M.S. and Count II charged Shade with first-degree sexual abuse of B.F. Shade was acquitted of those charges.

Shade was convicted of Counts III and IV. Count III charged Shade with first-degree sexual abuse, alleging that on December 22, 2018, he knowingly had sexual contact with M.S., a person who was incapable of consent because of dementia, by touching her genitals for his own sexual gratification. Count IV charged Shade with second-degree sexual abuse, alleging that on December 22, 2018, for the purpose of his own sexual gratification, he had sexual contact with M.S. by touching her breast with his mouth without her consent.[1] The evidence presented at trial, in the light most favorable to the verdicts, was as follows.[2]

M.S., B.F., and Shade's father were hospice patients at Macon Health Care Center ("Macon Health") in December 2018. Shade lived in Arizona, but came to Missouri on December 16th or 17th to visit his father, who was "actively dying." Shade's father's room was next to B.F.'s room, which was next to M.S.'s room. M.S.'s room and B.F.'s rooms were connected through a shared bathroom.

M.S. could not move on her own or roll over in bed without help. Although she suffered from dementia, "you could talk to [M.S.] and gain information from her." She could remember faces, carry on a conversation, tell you if she needed medical care, and recall events that had just happened. However, it was "obviously apparent" that M.S. was not able to consent to sexual activity.

Courtney Kelso and Amanda Schomaker were employed by Macon Health in December 2018 as certified nursing assistants. They worked the overnight shift starting at 7 pm on December 21st and ending at 7 am on December 22nd.

---

[1] Counts III and IV also alleged that Shade had previously been found guilty in 2004 of first-degree child molestation.

[2] Shade does not challenge the sufficiency of the evidence to support his convictions. We view the evidence in the light most favorable to the verdicts. *See State v. Howell*, 626 S.W.3d 758, 760 n.1 (Mo. App. W.D. 2021). To the extent we set forth evidence that is not favorable to the verdicts, we do so for context or because it is relevant to Shade's arguments on appeal.

2

Shade and his aunt visited Shade's father in the early evening of December 21st. They left, and Shade went to some local bars to drink. Shade returned "about midnight," and "rang the doorbell to be let into the building." Shade appeared intoxicated: he was "kind of stumbling and slurring his words." Kelso led Shade to his father's room, and he was "weaving up and down the hallway" and "bumped the wall whenever he was walking." The next time Kelso saw Shade he was coming out of B.F.'s room. Shade said, "Oops, wrong room."

At about 1:00 a.m., Schomaker and a nurse entered Shade's father's room, and Schomaker saw Shade lying on the spare bed "with his pants unbuttoned and laying open." Schomaker "could see his pubic hair."

Around 2:00 a.m., Kelso and Schomaker were doing "bed checks." When they checked on M.S., Kelso noticed three things out of the ordinary: M.S.'s "bedroom door was closed, her light was off, and the TV was off." This was odd because M.S.'s door was "always open, she always ha[d] the light on, and always ha[d] the TV on the religious station." Schomaker also noticed that M.S. "didn't have the cross she always slept with." When Kelso turned on M.S.'s bedroom light, she saw that M.S. was lying on her side. When Kelso had last checked on M.S., she was flat on her back, and M.S. was not able to roll over on her own.

When Kelso and Schomaker "went over to check on" her, M.S. said, "Why did that man have sex with me?" They asked M.S. to repeat herself, and she did. Kelso said, "Well, maybe you were just dreaming." M.S. responded, "Dreams don't hurt." M.S. was "flustered panicky" and seemed scared. Kelso put on gloves to check M.S.'s medical condition to see if she needed treatment. Kelso pulled down M.S.'s blanket and saw that the bottom half of M.S.'s "gown was pulled up to her waist," and the "top half of her gown was under her breast." Kelso and Schomaker "went to find the charge nurse," April Cross. They found Cross and explained what had happened.

3

Kelso and Schomaker then continued "checking the rest of the residents." When they checked on B.F., her door, too, was closed. When Kelso pushed open the door, B.F. "whipped her head around" and appeared "panicked." Kelso asked B.F. what was wrong, and B.F.'s response caused Kelso to find Cross and advise her that she also needed to speak with B.F. Kelso then went to the bathroom and threw up.

When Cross checked on M.S., M.S. was upset, "kind of shaking, [and] had a scared look on her face[.]" M.S. again reported being assaulted. Cross asked where she hurt, and M.S. pointed to her vagina. Cross asked who hurt her, and M.S. responded "a skinny man with a large penis." After speaking with M.S., Cross called the Macon Health administrator, Rachel Richardson.

Richardson was awakened by Cross's call at 2:23 a.m. Cross notified Richardson "that there had been an allegation from a resident that she had been raped." When Richardson arrived at Macon Health, she first met with Cross. Richardson then conducted a physical examination of M.S. Richardson saw a bruise on M.S.'s left breast "that was purplish and green and had a spot inside it." "[I]t was hard for [M.S.] to speak because she was so upset." "[S]he was shaking more than usual," and she was tearful. Richardson called the police, M.S.'s durable power of attorney, "the state and the medical director and [M.S.'s] doctor."

At 2:45 a.m., Schomaker was sitting in her car in the parking lot, on a break. She saw Shade get into his car and "peel[] out of the parking lot."

Police officer Ben Hodges was dispatched to Macon Health after Richardson called the police and reported a sexual assault. He first spoke with Richardson and asked if the victims needed medical attention. Richardson requested "both victims be checked out by medical professionals." As a result, Hodges "radioed [the] 911 center and had them dispatch EMS, an ambulance" to Macon Health. Hodges then spoke with M.S. and B.F. M.S. told Hodges that a "younger, white,

4

taller, skinny male came into her room and assaulted her in a sexual way." M.S. reported "there was liquid on her from him."

An ambulance arrived to take M.S. to the hospital. Jennifer Whitmire, an emergency medical technician, rode with M.S. in the ambulance. During that ride, M.S. complained of a stomach ache, that she was "gonna throw up," and that her heels hurt. M.S. told Whitmire that "a man had crawled into bed with - - on top of her and was pushing against her and choking her, and she felt like she was gonna die." Upon arriving at the hospital, Whitmire "took [M.S.] into the ER" and to her "assigned room." Whitmire gave the nurse at the hospital "a report," and had no further contact with M.S.

Amanda Ferreiro, a sexual assault nurse examiner, conducted M.S.'s sexual assault forensic exam ("SAFE exam") at 7:00 a.m. on December 22nd. Ferreiro evaluated M.S. "to make sure that she was stable, and make sure that she didn't have any emergent medical conditions that need to be perceived by a provider." M.S. said she "remembered everything that happened" and she "had vaginal pain." M.S. told Ferreiro that her attacker had put his penis in her vagina and she was unsure if he had put his finger in her vagina. M.S. also told Ferreiro:

> There was a man standing over me in my bedroom. He laid down on top me [sic] and put his penis inside of me. He kept asking me if I could do this once or twice a day. I told him he was crazy. He told me he'd be back again.

When asked if there "was a physical blow or a punch," M.S. responded "[i]n my vagina." When asked if she was physically restrained, M.S. responded "that his arm was across her neck." When asked if she was choked or strangled, M.S. repeated "that the arm was across the neck." M.S. told Ferreiro that her attacker had "put his penis in her mouth, and he put his mouth on her vagina." M.S. also said that "he had licked or kissed her across her breast."

Based on M.S.'s statements, Ferreiro swabbed areas of M.S.'s breast for potential evidence. Ferreiro also took swabs from M.S.'s "mouth for the standard DNA, from her labia minora, from a labia majora, her vagina, and her cervix." Ferreiro packaged the swabs and included them in the SAFE exam forensic kit.

Ferreiro documented M.S.'s injuries, which included tenderness and an "erythema"—or redness—on her throat, an area "above her left breast that had bruising, swelling, and . . . was tender," and "redness and tenderness in her left groin region." M.S. also had areas of bruising on the back of her right arm, on her right hand, on her right midcalf, and on her left leg below the knee. She had an abrasion behind her left shoulder that was red, and "an area of redness" on her right forearm.

Ferreiro performed a genital examination. M.S.'s "periurethral tissue," which is "at the very top of the vagina on the outside," was "really red" and "extremely painful." "[I]t was very hard for [Ferreiro] to perform the exam because [M.S.] was so tender." Ferreiro also found an abrasion on M.S.'s labia minora that "wasn't old," and she "could tell that there had been trauma to that area." Ferreiro believed that the abrasion was "consistent with [M.S.'s] story of sexual assault." After M.S.'s SAFE exam was complete, Hodges collected the SAFE exam kit and transported it to the police department.

In the course of Hodges's investigation, he learned that "the only male in the entire facility [that night] who matched the general description was Jason Shade, and the only other male in that wing of the nursing facility was Jason Shade's father." Hodges learned Shade was staying at the Comfort Inn. Around 6:00 a.m. on December 22nd, Hodges went to the hotel, and a hotel employee accompanied him to Shade's room. When Shade answered the door, "[i]t looked like he had just

6

woken up, and [Hodges] smelled a strong order of intoxicants from him like he had been drinking." Hodges placed Shade under arrest and transported him to the Macon Police Department.

At the police department, Shade waived his Miranda rights, and told Hodges "he knew what this was all about." Shade claimed that while he was at Macon Health earlier that morning, "he opened the wrong door to another resident's room, and she screamed at him to get the hell out." Shade denied the assault allegations. He provided no explanation for "how his DNA could have been on [M.S.]"

Hodges obtained a search warrant to collect bodily evidence from Shade for DNA comparison purposes. A medical professional collected hair, saliva, and fingernail clippings from Shade.

Britni Livingston, a detective with the Macon Police Department, also investigated the assault of M.S. Livingston located a "partial palm print" on the headboard of M.S.'s bed. She "sent that to the lab," but "basically the palm print was too smudged up to - - for comparison purposes."

Livingston met with Shade "two or three days after [she] started investigating." When she first met him, he said he did not want to speak to her without an attorney present. Shade "provided [her] with information," but Livingston "wasn't able to ask questions back to that." Shade never mentioned that he was in M.S.'s room, or that he had turned her over or moved her. He did not provide an explanation for how his DNA could have ended up on M.S.'s body.

Livingston listened to Shade's jail phone call recordings. In one conversation between Shade and his wife or mother, Shade said "that the prosecutor should be concerned with what he was guilty of and not what they think he's guilty of." Livingston "took that as" meaning Shade "was guilty of doing something at the nursing home."

7

When M.S. returned to Macon Health from the hospital, she was "very scared" and "was in pain." She did not want to return to her room. She refused to eat or drink because she "was nauseated." M.S. passed away three days after the assault, on the morning of December 25th. Before she passed away, she was presented a photo lineup and identified Shade as the person who had assaulted her.

Teresa Shank, a forensic DNA analyst at the Missouri State Highway Patrol Crime Laboratory, analyzed the SAFE exam evidence collected from M.S. Shank did not detect any seminal fluid in the swabs collected from M.S. However, she developed a DNA profile from the swabs of M.S.'s labia majora. That profile was "characteristic of originat[ing] from two individuals and the DNA profile exhibit[ed] male and female gender characteristics." Shade was a possible contributor to the DNA profile. It "was 66.23 sextillion times more likely that the DNA mixture resulted from a mixture of [M.S.] and Jason Shade than it would have originated from [M.S.] and an unknown, unrelated individual."[3]

M.S. also developed a DNA profile from the swabs of M.S.'s breast. Shade was the major contributor of the DNA in the profile. "There was so much DNA [from Shade] found on the chest swabs that it was more DNA than [M.S.] contributed herself."

Shade testified at trial. He stated that he arrived in Missouri on December 16th or 17th to visit his father, and that he stayed with his father "24/7" because he wanted to be there when he passed away. During the day on December 21st, Shade stated that he went to smoke a cigarette and heard M.S. "hollering" for help. He said M.S. had "completely slid out of her chair" in her room, and Shade could not find any nurses so he tried to help her up. According to Shade, "when [he]

---

[3] Shank testified that there are "21 zeros in a sextillion," and there are "about 7 billion people on the planet."

tried to help her sit up, she was like a sack of potatoes," and he did not want to "dislocate this lady's arm," so he went to the nurse's station to get help. Shade said he only touched M.S.'s hand.

Shade testified that sometime after 7:00 p.m. that evening, he went to his hotel room to shower, and then went to two local bars. Shade's plan was to "go drink and shoot pool" and "lighten [his] head." Shade admitted that he was intoxicated when he left the bars and returned to Macon Health around midnight. Shade said he visited his father, and then went to the smoke room. Shade testified that he made "20 thousand trips" from his father's room to the smoke room that night, and remembered "walk[ing] into several different rooms."

"At some point," Shade was in M.S.'s room, and he said he "had a full blown conversation" with her. Shade testified M.S. was lying flat on her back, and M.S. said the nurses "wouldn't help." According to Shade, he picked her up and turned her on her side because he was afraid she had bed sores. Shade testified his father had suffered from bed sores at a previous nursing facility. Shade went back to his father's room and tried to sleep, but he couldn't, so he "got up and left" Macon Health. He stated he left about 15 or 20 minutes after his interaction with M.S. Shade testified he was "agitated" when he left because of "the stuff [he was] dealing with with [his father], the bed sore thing . . ." Shade said he returned to his hotel room and went to sleep. Shade denied having sexual intercourse or "[a]ny kind of sexual activity" with M.S. He also denied touching B.F.

Shade testified that he exchanged phone numbers with three different Macon Health nurses while he was visiting his father, and that he was "kind of flirty more than [he] should have been." He said he gave Kelso his number "just to flirt," but also he "wanted to know about [his] dad's condition." Kelso testified that Shade texted her a photograph of himself naked in a hot tub.[4] His

---

[4] Shade testified that he "got a [hotel] room with a big huge hot tub in it."

penis was visible in the photo. Kelso was not expecting him to send her such a photo, and she thought it was inappropriate. In the 24-hour period prior to M.S.'s assault, there were "multiple contacts" between Kelso's phone and Shade's phone.

After the jury returned its verdicts, the trial court sentenced Shade to serve 15 years on Count III (first-degree sexual abuse) and four years on Count IV (second-degree sexual abuse), to run concurrently.

Shade raises four points on appeal, each asserting improper admission of evidence at trial. In his first point, Shade argues the trial court abused its discretion in admitting Kelso's "irrelevant" testimony about why she left her employment at Macon Health. Shade's second and third points assert the trial court erred and abused its discretion by admitting hearsay statements M.S. made to Whitmire while being transported to the hospital (Point II) and testimonial hearsay statements M.S. made to Ferreiro during the SAFE exam (Point III). In his fourth point, Shade argues the trial court "plainly erred in allowing the State to present evidence of a polygraph test offered and refused."

**Standard of Review**

"The circuit court has broad discretion to admit or exclude evidence during a criminal trial," and we will not reverse absent "a clear abuse of this discretion." *State v. Loper*, 609 S.W.3d 725, 731 (Mo. banc 2020) (internal marks omitted). "An abuse of discretion occurs only if the circuit court's ruling admitting or excluding evidence is clearly against the logic of the circumstances then before the court and is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration." *Id.* (internal marks omitted). On appeal we determine whether the trial court abused its discretion in making its evidentiary rulings, "not whether the evidence was admissible." *State v. Lawrence*, 569 S.W.3d 545, 552 (Mo. App. S.D. 2019). "If reasonable persons may differ as to the propriety of an action taken by the trial

10

court, then there was no abuse of discretion." *State v. Quick*, 334 S.W.3d 603, 609 (Mo. App. W.D. 2011). Even if we find the trial court abused its discretion, we will only reverse if the defendant suffered prejudice. *State v. Ellis*, 512 S.W.3d 816, 825 (Mo. App. W.D. 2016). "Trial court error in the admission of evidence is prejudicial if the error so influenced the jury that, when considered with and balanced against all of the evidence properly admitted, there is a reasonable probability that the jury would have reached a different conclusion without the error." *Id.* (quoting *State v. Miller*, 372 S.W.3d 455, 472 (Mo. banc 2012)).

However, when a defendant has not preserved his claim of evidentiary error, we may only review for plain error. *Loper*, 609 S.W.3d at 731. "Plain error review requires a two-step inquiry." *State v. Marley*, 598 S.W.3d 204, 210 (Mo. App. W.D. 2020). "First, we must determine whether the claimed error is plain error affecting substantial rights." *Id.* (internal marks omitted). "Plain error is error that is evident, obvious, and clear." *Id.* at 211 (internal marks omitted). "Second, if plain error affecting substantial rights is found, the Court determines whether the error [resulted] in manifest injustice or a miscarriage of justice." *Id.* "To hold that a miscarriage of justice or a manifest injustice occurred, we must determine that there is a reasonable probability that the jury's verdict would have been different, had the error not taken place." *State v. Roper*, 136 S.W.3d 891, 903 (Mo. App. W.D. 2004). The appellant "bears the burden of showing that plain error occurred and that it resulted in a manifest injustice or miscarriage of justice." *Id.* at 900.

### Point I – Evidence of Kelso Changing Careers

Shade argues in Point I that the trial court "abused its discretion in overruling the Defense's objection to Courtney Kelso's irrelevant testimony about why Kelso left her employment at Macon Health, because Kelso claimed the alleged incident was so stressful that it caused Kelso to leave her nursing career and become a gas station attendant, . . . in that this evidence was irrelevant, had

11

little to no probative value, and its prejudicial impact created the implication that this incident was so horrific that Kelso was unable to pursue her chosen career." We disagree that the trial court abused its discretion in admitting this testimony, and further find Shade did not suffer prejudice as a result of its admission.

The testimony relevant to this point occurred at the beginning of Kelso's direct examination:

Q. And where do you work now?

A. At a gas station.

. . .

Q. If you wouldn't mind telling us the circumstance - - why did you get out of nursing?

A. Just - - too stressful.

Q. Okay. Did it relate to why you're here today?

A. Yes.

Q. Could you elaborate on that a little bit?

[Defense counsel]: Object, Your Honor.

At a side bar, defense counsel asserted his objection was "to relevance," arguing that "how she feels today about what happened two years ago. It's not relevant to this case." The State responded that "the circumstances surrounding her leaving would go to her credibility." The trial court overruled the objection. The State continued its direct examination:

Q. So, Courtney, do you remember the question I asked?

A. No.

Q. Basically, could you explain to us why you left Macon Health Care?

A. Because it was too stressful thinking about the incident that happened there.

12

Q. Okay. And when you say, "the incident that happened there," you're - - you're talking about why we're here today?

A. Yes, sir.

We find no abuse of discretion in the admission of this testimony, as the fact Kelso left her nursing career because of the stress she felt relating to M.S.'s assault was probative of Kelso's credibility. Evidence that Kelso felt so upset about M.S.'s sexual assault that she had to change careers tended to show that the events described by Kelso actually happened, as opposed to Kelso fabricating the assault allegations and planting the story in M.S., as defense counsel suggested during closing arguments:

> It was just flirting, you know. So that was going on. I don't know if something happened. I mean, Courtney got up and said she was really, I guess, offended by that photo. You know, something might have made her mad. I don't know. But, she's the first person that discovers [M.S.] . . . And [M.S.] says whatever she says. I - - we don't know what she said. We know what Courtney says she said.

"Anything that has the legitimate tendency to throw light on the accuracy, truthfulness, and sincerity of a witness is proper for determining the credibility of the witness." *State v. Hahn*, 37 S.W.3d 344, 355 (Mo. App. W.D. 2000) (internal marks omitted).

Additionally, this evidence was relevant to show that Kelso left Macon Health because of stress as opposed to being terminated for improper conduct. In Shade's opening statement, defense counsel told the jury that Shade was upset about his father's treatment at Macon Health. Indeed, Shade testified at trial that the staff were not providing proper care to the patients, including M.S. and his father, and the "night shift nurses just bluntly [were] on methamphetamines and [were] walking around with their jaws - - she grinds her jaw." Based on Shade's opening statement, the State was entitled to present evidence during Kelso's direct examination that would refute anticipated attacks on her credibility. *See State v. Gibbons*, 629 S.W.3d 60, 91-92 (Mo. App. W.D. 2021) (where the defendant's opening statement showed his intent to use the victim's failure to

13

disclose the abuse to attack her credibility, the prosecutor properly questioned the victim on direct examination about her failure to disclose in an attempt to minimize the damage to the victim's credibility). Without evidence that Kelso left Macon Health because of the stress of M.S.'s assault, the jurors could have inferred from Shade's testimony that Kelso was terminated from Macon Health for reasons relating to insufficient care of patients or drug use, and, as a result, could have concluded that her testimony was less credible. Accordingly, we find the trial court did not abuse its discretion in admitting this testimony.

However, even if we were to find the trial court abused its discretion, we would not reverse because Shade did not suffer prejudice from Kelso's further elaboration on why she left Macon Health. Kelso testified, without objection, that she "[got] out of nursing" because it was "too stressful," and her change of career related to the events that were the subject of the trial. Defense counsel only objected when the State asked Kelso to "elaborate on that a little bit." After that objection was overruled, Kelso testified that "it was too stressful thinking about the incident that happened there." This testimony was similar to her previous, unobjected-to testimony about why she changed careers. "Generally, prejudice does not exist when the objectionable evidence is merely cumulative of other evidence that was admitted without objection and that sufficiently establishes essentially the same facts." *State v. Wilson*, 602 S.W.3d 328, 334 (Mo. App. W.D. 2020).

Further, the jury acquitted Shade of Counts I and II, demonstrating that Kelso's alleged "irrelevant" testimony about why she left Macon Health ultimately did not affect the jury's ability to objectively assess Kelso's credibility, as the jurors did not wholly credit the evidence—including Kelso's testimony—that tended to show Shade raped M.S. or abused B.F. To that end, and given the evidence of Shade's guilt—which included the discovery of Shade's DNA on M.S.'s

14

breast and genitals—we find no reasonable probability existed that the jury would have acquitted

Shade of Counts III and IV absent Kelso's testimony explaining why she changed careers.[5]

Point I is denied.

### Point II – Hearsay Statements During Ambulance Ride

In his second point, Shade asserts the trial court abused its discretion in "admitting M.S.'s

hearsay statements made during the ambulance ride to Whitmire," arguing this testimony "did not

meet the treating physician exception to the admission of hearsay statements."

First, we note that this claim of error was not properly preserved because it was not

included in Shade's motion for new trial. *See State v. Stanley*, 609 S.W.3d 903, 909 (Mo. App.

W.D. 2020) ("To preserve a claim for appellate review, an appellant must include the specific

allegation of error in the motion for new trial."). Neither the motion for new trial filed by defense

counsel[6] nor the *pro se* addendum to the motion filed by Shade asserted a claim of improper

admission of hearsay statements through Whitmire's testimony. *See State v. Ratliff*, 622 S.W.3d

---

[5] In the argument section of his brief, Shade asserts that evidence that Kelso threw up after talking to M.S. and B.F. was also irrelevant and prejudicial. However, Shade did not properly challenge this evidence in his point relied on. *See State v. Lammers*, 479 S.W.3d 624, 636 n.13 (Mo. banc 2016) ("Errors raised in the argument portion of a brief but not raised in the points relied on need not be considered by this Court."). Moreover, during trial, defense counsel did not object to this evidence at the earliest opportunity. Kelso testified that she went to the bathroom "because [she] had to get sick," the prosecutor asked if that meant she "threw up," and Kelso answered, "Yes." Then defense counsel objected. This objection was untimely. *See State v. Blurton*, 484 S.W.3d 758, 774-75 (Mo. banc 2016) (objection was not made "at the earliest possible opportunity," but instead was made only after the witness had answered two questions, therefore the objection was not timely and the challenge to the evidence was not preserved for review). For these reasons, we decline to address Shade's arguments as to the relevance or prejudicial impact of Kelso's testimony that she threw up.

[6] On appeal, Shade asserts this claim was properly preserved, citing the first page of the motion for new trial filed by defense counsel. However, the first page of that motion does not contain the claim raised in this point on appeal. Rather, paragraph 3 of that motion alleged the trial court erred when it "overruled the defendant's objection to physical complaints made by the alleged victim," because this information "was not relevant and was prejudicial." Paragraph 3—which is likely not sufficiently particular to preserve any claim on appeal relating to "physical complaints made by the alleged victim"—does not allege the trial court erred in admitting any statements on hearsay grounds, let alone the specific testimony of Whitmire that is the subject of Point II. *See State v. Guidorzi*, 895 S.W.2d 225, 228-29 (Mo. App. S.D. 1995) (when a defendant raises a claim in a motion for new trial relating to the erroneous admission of evidence, "'the evidence complained of must be substantially stated or identified, and the reasons why it is claimed to have been inadmissible must be assigned'" (quoting *State v. Lord*, 286 S.W.2d 737, 740 (Mo. 1956)).

736, 745 (Mo. App. W.D. 2021) (the same objection that is made during trial "must be set out in the motion for new trial and must be carried forward in the appellate brief"). Because this claim was not properly preserved, we review for plain error. *See Stanley*, 609 S.W.3d at 909.

At issue in Point II is Whitmire's testimony that M.S. told her while being transported to the hospital that "a man had crawled in bed with - - on top of her and was pushing against her and choking her, and she felt like she was gonna die." Shade asserts this testimony did not fall within the "treating physician" exception to the hearsay rule because the statements were "not made to a treating physician and were not made for the purpose of medical treatment or diagnosis." We disagree.

Hearsay is an out-of-court statement offered for the truth of the matter asserted, and is admissible only if it falls within a recognized hearsay exception. *State v. Crews*, 406 S.W.3d 91, 93 (Mo. App. W.D. 2013). "One of these exceptions pertains to statements made to a physician as long as the 'statements are reasonably pertinent to diagnosis and treatment.'" *Id.* (quoting *Breeding v. Dodson Trailer Repair, Inc.*, 679 S.W.2d 281, 285 (Mo. banc 1984)). "Medical history and cause of injury are relevant to a patient's diagnosis and treatment." *Groves v. Ketcherside*, 939 S.W.2d 393, 398 (Mo. App. W.D. 1996). Further, to qualify under this exception, the statement need not be made directly to a physician. *See Crews*, 406 S.W.3d at 93 ("This treating physician hearsay exception has been expanded to cover statements made to a nurse for the doctor's use in treating the speaker." (internal marks omitted)); *see also State v. Jackson*, 426 S.W.3d 717, 720 (Mo. App. E.D. 2014) (statements made to nurse performing SAFE exam fell within treating physician hearsay exception).

First, we find that Whitmire was a qualified medical professional for purposes of this hearsay exception. Whitmire testified that her job was to provide medical assistance, and that she

16

"monitored [M.S.'s] blood pressure, pulse, and oxygen saturations" while M.S. was being transported to the hospital. Whitmire stated that she often converses with patients while transporting them to gain information about "what's happened to them," and the information provided is important to the patients' medical care. She testified that after M.S. arrived at the hospital emergency department, Whitmire reported to the nurse and passed on "pertinent information" that she had learned from M.S. about what had occurred.[7] Thus, we find Whitmire preformed a similar role to that of a nurse who meets with a patient and reports the relevant medical findings to the doctor for diagnosis and treatment. As such, under the facts of this case, the physician hearsay exception extended to Whitmire in her capacity as an emergency medical technician. *Cf. Crews*, 406 S.W.3d at 94 (statements made to Medicaid case manager did not fall under physician hearsay exception, in part because the case manager's role was "not to diagnose or treat" and the case manager had no medical training).

We further find the challenged statements were "reasonably pertinent to diagnosis and treatment." M.S. told Whitmire she had been choked and "she felt like she was gonna die." This information was relevant to diagnose and treat possible injuries. Indeed, during Ferreiro's examination of M.S., she documented injuries to M.S.'s neck and throat, which included tenderness and an "erythema," or redness. M.S.'s statements about the cause of these injuries were "reasonably pertinent to diagnosis and treatment," notwithstanding that M.S.'s throat injuries did not appear to require medical treatment. *See Jackson*, 426 S.W.3d at 720 (rejecting the defendant's argument that the victim's statement about what had occurred during the sexual assault was not pertinent to her treatment or diagnosis because there was no trauma to her cervix or vagina, noting that the nurse "would not have known to do the examination if Victim had not told her she had

---

[7] Nurse Ferreiro's later testimony, in which she read portions of her SAFE exam report, confirmed that "[p]er EMS, patient reported she had been sexually assaulted."

17

been sexually assaulted," and the victim's statements "were necessary for [the doctor] and [nurse] to explain what course of treatment they chose in diagnosing Victim").

Because the challenged testimony fell within the treating physician hearsay exception, the trial court did not err—let alone commit an evident, obvious, and clear error—in admitting the testimony.

Additionally, we find Shade failed to demonstrate he suffered manifest injustice or miscarriage of justice from the admission of this evidence. Numerous individuals—including Kelso, Schomaker, Cross, and Hodges—testified that M.S. reported being sexually assaulted in her bed by an unknown man. Shade was the only man at Macon Health fitting the description given by M.S., and M.S. later identified him as her assailant in a photo line-up. His DNA was found on M.S.'s chest and genitals. In light of this evidence, we find no reasonable probability exists that the jury would have acquitted Shade of sexual abuse had the trial court excluded M.S.'s statement, through Whitmire, that M.S.'s attacker "was pushing against her and choking her, and she felt like she was gonna die." *See State v. Fuente*, 871 S.W.2d 438, 443 (Mo. banc 1994) (no manifest injustice would have resulted from admission of inadmissible evidence where there was ample other evidence to support the conviction).

Point II is denied.

### Point III – Testimonial Hearsay During SAFE Exam

In Point III, Shade asserts the trial court erred in "not sustaining the Defense's objection and admitting M.S.'s hearsay statements through Ferreiro, because the statements were made during a forensic examination, making the statements testimonial and thereby inadmissible, which violated Shade's rights to confrontation."

As an initial matter, we find that the Confrontation Clause violation Shade asserts on appeal was not preserved because it was not raised before the trial court. During trial, Shade only objected to Ferreiro's testimony on the grounds that it was hearsay, asserting the testimony did not fall within the treating physician hearsay exception. The trial court overruled this objection.[8] Shade never objected to Ferreiro's testimony on the grounds that it was ***testimonial*** hearsay that violated his rights under the Confrontation Clause. "A hearsay objection does not preserve constitutional claims relating to the same testimony." *State v. Minner*, 311 S.W.3d 313, 319 (Mo. App. W.D. 2010) (finding the defendant's hearsay objection at trial did not preserve his claim on appeal that the hearsay was testimonial and thus violated his rights under the Confrontation Clause); *see also State v. Kemp*, 212 S.W.3d 135, 147 (Mo. banc 2007) (Although the Confrontation Clause analysis "is similar to the hearsay analysis, this is a separate and distinct evidentiary determination."); *State v. March*, 216 S.W.3d 663, 665 (Mo. banc 2007) ("falling within a hearsay exception does not resolve the Confrontation Clause issue"). Because Shade failed to raise his Confrontation Clause claim to the trial court, it is not preserved, and we can only review it for plain error.[9] *See Minner*, 311 S.W.3d at 319.

We now turn to the merits of Shade's claim. The Confrontation Clause states that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. Const. amend. VI. "In *Crawford v. Washington*, the United States Supreme

---

[8] Upon defense counsel lodging his hearsay objection, the parties argued at a side bar whether this testimony fell within the treating physician hearsay exception. The trial court advised that "this is . . . a pretty important issue in this case," so it was "gonna let the jury step out, and we're gonna have some argument about this and look at some case law." A thirty-minute recess was taken, and there is no record of what occurred during that recess, including the trial court's ruling on defense counsel's objection. When the trial resumed, Ferreiro testified about what M.S. told her during the SAFE exam without objection. Thus, we presume the trial court overruled defense counsel's hearsay objection.

[9] We also note that Shade did not include a Confrontation Clause claim relating to Ferreiro's testimony in his motion for new trial or the *pro se* addendum to the motion.

Court held that the Confrontation Clause demands that all *testimonial* evidence be excluded unless the declarant is unavailable to testify and the defendant had a prior opportunity for cross-examination." *March*, 216 S.W.3d at 665 (emphasis in original) (citing *Crawford v. Washington*, 541 U.S. 36, 68 (2004)). "*Crawford* did not offer a precise definition of 'testimonial statements,'" but "[i]t discussed how testimonial statements are made by witnesses who 'bear testimony' and that 'testimony' is defined as '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" *Id.* at 666 (quoting *Crawford*, 541 U.S. at 51, 68). "An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." *Crawford*, 541 U.S. at 51. In later decisions, the U.S. Supreme Court further clarified that, in determining whether a statement is testimonial, we ask whether the statement "was given with the 'primary purpose of creating an out-of-court substitute for trial testimony.'" *See Ohio v. Clark*, 576 U.S. 237, 250-51 (2015) (quoting *Michigan v. Bryant*, 562 U.S. 344, 358 (2011)).

Shade argues that statements M.S. made about the assault to Ferreiro during the SAFE exam were testimonial. He contends the purpose of M.S.'s SAFE exam was to establish past events relevant to a later criminal prosecution, asserting "Ferreiro was acting as a government agent at the request of law enforcement, using a kit created and supplied by law enforcement, collecting evidence for the exclusive use of law enforcement, and creating a report which is given directly to law enforcement." The State counters that "[s]tatements that are not made to law enforcement personnel or governmental agents are not testimonial in nature," that the facts here "did not involve an *ex parte* examination by the government used against the accused," and the "statements lacked the requisite formality and solemnity . . . necessary to be considered 'testimonial' for purposes of the Confrontation Clause."

20

We ultimately need not resolve whether M.S.'s statements during the SAFE exam were testimonial, however, because even if they were, we find their admission did not result in manifest injustice or a miscarriage of justice. M.S.'s statements to Ferreiro that a man was "standing over [her] in [her] bedroom" and he "laid down on top [of her] and put his penis inside of [her]" were cumulative to other evidence at trial. Kelso, Schomaker, and Richardson testified that M.S. reported being raped in her bedroom, and Hodges, Whitmire, and Cross also testified that M.S. reported being sexually assaulted. In other words, numerous other witnesses provided similar testimony concerning M.S.'s allegation of sexual assault. *See State v. Brandolese*, 601 S.W.3d 519, 536 (Mo. banc 2020) (no manifest injustice resulted from the admission of evidence alleged to have violated the defendant's right to confrontation, where the challenged evidence was cumulative to—or "reiterate[d] the same point" as—other evidence).

Moreover, according to Ferreiro, M.S. said Shade put his penis in her vagina, but M.S. was not sure if Shade put his finger in her vagina. The verdicts reflected that the jurors did not credit this testimony: The jury ultimately acquitted Shade of rape and convicted him of first-degree sexual abuse by "touch[ing] the genitals of M.S." To that end, and considering the other evidence of guilt—Shade's DNA on M.S.'s breast and genitals, the fact that Shade was the only man at Macon Health fitting the description given by M.S., and that M.S. later identified Shade as her attacker—we find there was no reasonable probability that the jury's verdict would have been different absent the admission of the alleged testimonial statements made to Ferreiro.

Point III is denied.

### Point IV – Polygraph Evidence

In his fourth point, Shade asserts the trial court plainly erred in allowing the State to present evidence of a polygraph test offered and refused. However, we find Shade waived plain error

21

review of this claim because the record makes clear that defense counsel affirmatively made the strategic decision not to challenge the admission of this evidence.

The polygraph evidence at issue was adduced during the testimony of investigator Livingston. On cross-examination, defense counsel asked Livingston about meeting with Shade in the course of her investigation and doing "maybe some other types of procedures":

Q. Okay. You did meet with the defendant?

A. I did.

Q. Okay. And one thing - - I don't know if you ever conducted a full interview. I know that you were talking about - - with the defendant about doing maybe some other types of procedures; is that correct?

A. Right.

Q. I mean, it wasn't a normal interview like maybe - -

A. No. He declined that.

On re-direct, the State did not ask Livingston about the "other types of procedures." On re-cross, defense counsel again asked Livingston about her meeting with Shade, and "doing some sort of test":

Q. Okay. And when you met with him, it wasn't to interview him. It was for another purpose; right? I mean, it was discussing possible avenues of investigation, but it wasn't a - - a direct interview; right? You weren't asking him specific questions about the charges; correct?

A. I believe during that conversation, he told me he didn't want to speak with me without a - - an attorney present, and so he provided me with information.

Q. Uh-huh.

A. And I wasn't able to ask questions back to that.

Q. Right. But it was - - it was just talking to you about doing some sort of test?

A. Yes.

On further re-direct, the State asked Livingston about the "test" she had previously mentioned:

Q. Okay. So [defense counsel] asked about a test that was gonna be - - you're [sic] conversation with Mr. Shade, and it involved a test. What type of test - - what are we talking about here?

[Defense counsel]: Objection. Just a second. May I speak with the prosecutor for a second?

THE COURT: Sure.

(Counsel had a brief discussion off the record.)

[Prosecutor]: Do you - - do you remember the question I asked?

A. What kind of tests we were talking about?

Q. Yeah. Okay.

A. I - - I believe he's talking about a polygraph test.

Q. And ultimately, was there a polygraph test given?

A. No.

Q. Is that because, ultimately, he refused to do that?

A. Yes.

Q. And originally, you were talking about that possibility; correct?

A. Of taking a polygraph test?

Q. Yes.

A. Yes.

Q. And he had some very specific things he didn't want you to ask about; isn't that right?

A. He had very specific questions for me to only ask him.

Q. Okay. And so I - - what'd you tell him about that? I mean, were you gonna allow him to dictate what questions would be asked?

A. No. That's not how those questions are performed.

23

Q. And then once that information was conveyed to him, he didn't want to take the polygraph?

A. We had multiple - - I think we had two conversations about taking a polygraph, and I don't remember exactly the order of this, but one was denied due to his attorney's advice and then I think one was denied due to him not wanting to take it if he had to answer any question asked of him.

Q. Is that something you would have been willing to do and was offered to the defendant?

A. Yes.

Defense counsel asked additional questions about the polygraph test on re-cross:

Q. Mr. Shade contacted you or had communications that reached you saying that he wanted to talk about doing a polygraph?

A. Yes.

Q. Okay. And this was approximately a week after he was arrested; correct?

A. Yes.

Q. All right. And Mr. Shade was - - has been adamant the whole time that there wasn't any sexual assault that occurred; correct?

A. Yes.

Q. With you or with the officers?

A. Yes.

Q. Okay. And I don't know if you're familiar with the original arrest, but Mr. Shade wasn't even aware that a rape allegation was being made, would you agree with that?

A. I don't know. I wasn't there for the original arrest.

Q. Okay. All right. When you talked to him - - when you met with him on the first to talk to him about the polygraph, you were there because he had asked it?

A. Yes.

24

Q. And when you started talking about a polygraph, he did talk to you about the fact that he now had an attorney?

A. Yes.

Q. All right. And you understand, of course, that no matter what the results of a polygraph, it's not admissible evidence; right?

A. Correct.

Q. Okay. And so he said no, he wasn't gonna do it because he - - he - - he got advice from his attorney; right?

A. Right.

Q. Do you remember what the advice was?

A. Something about working out a deal.

Q. Yeah. Don't - - you're not gonna do a polygraph unless you get a deal from the prosecutor; right? If he passes, he dismisses. That's the deal.

A. I - - I guess so. I'm not a prosecutor.

Q. Okay. All right. But it's not admissible as evidence, but something is admissible about a polygraph, isn't it? Not the polygraph, not the results, but there is something admissible. Could be something that's admissible out of it. Do you know what that is?

A. [Shakes head]

Q. All right. You - - you know that anything that my client says to you during your investigation you could testify to the jury; right?

A. Correct, right.

Q. Anything he says?

A. Right.

. . .

Q. Well, let me ask you this. If you did a polygraph on Mr. Shade and he passed, how would that help him?

A. I wasn't worried about what would help him. I was worried about - -

25

Q. I know.

A. - - what would help the prosecution.

On re-direct, the State asked Livingston if she "offered to give the defendant a polygraph, which is a lie detector test," and she answered in the affirmative. The State asked why she offered him the test, and she responded "Polygraphy's [sic] help law enforcement with investigative leads."

Defense counsel followed up with further questioning about polygraph tests, including

Q. If you perform a polygraph on a suspect and they pass it, is it common for the police to then tell the suspect that they failed? A technique to get somebody that they think is guilty to confess?

A. I don't know. I've - - I don't do that.

. . .

Q. Okay. So you - - you're taught techniques and ways to interview defendants in order to elicit admissions; right?

A. Right

Q. And part of those techniques could include lying to the defendant?

The State objected and the following exchange occurred at a side bar:

[Prosecutor]: She already testified that she doesn't use that technique. You're trying to get her to comment on what techniques are used by other officers. It's not relevant.

[Defense counsel]: I'm just asking her what training she receives and whether it's part of their training that police officers can lie. You opened this door and I had to get up there.

. . .

[Defense counsel]: You're - - you opened this door by bringing up this polygraph. I kept it there. You just want him to do more test or talk about - - do more tests. That's what we kept it at. You opened up polygraph.
    I get an opportunity to explore the techniques that are used in the polygraphs which would explain why I'm telling my client, "Don't do that unless you have a deal." It's - - it just seems like - -

26

The trial court ruled that defense counsel could "ask [Livingston] what she's done" in terms of investigative techniques, but Livingston could not "comment on what could have been done." Defense counsel then asked Livingston the following:

Q. Do you have any idea why an - - are you privileged to any reason - - are you privileged to any thought process that goes between advising a client regarding a polygraph?

A. No.

Q. All right. So when he tells you that he was advised by his attorney not to take a polygraph, unless the prosecutor is making him some sort of offer, you don't really know the reasons why that would be conveyed to the defendant?

A. No.

Questioning about polygraphs concluded with the State asking Livingston the following:

Q. Have you been involved in cases where a polygraph was given and charges were either dismissed or not filed?

A. Yes.

Q. And have you ever been involved in a case where the results of a polygraph were used against a defendant, that the results - - whether or not they would be integral in trial?

A. No.

Q. And you offer - - did you origin - - initially offer this test or did the defendant bring that up?

A. I don't recall that.

Q. But it - - it was available to him and he chose not to do it?

A. Correct.

Based on the above, we find Shade waived plain error review. "[P]lain error review is waived when [a] defendant affirmatively makes [a] strategic decision not to object to the admission of [evidence] or states that it has no objection; plain error review is only available where no

27

objection is made due to inadvertence or negligence." *State v. Rios*, 314 S.W.3d 414, 425 (Mo. App. W.D. 2010) (citing *State v. Johnson*, 284 S.W.3d 561, 582 (Mo. banc 2009)). This is the unusual case in which it is apparent from the record that defense counsel made a strategic decision not to contest the polygraph evidence. Defense counsel objected when the State asked Livingston "what type of test" she was referencing, but he then asked to speak to the prosecutor. They spoke off the record, and when trial resumed defense counsel did not further elaborate on his objection, nor did he request a ruling on the objection. The State then asked Livingston again what test she was referencing, and defense counsel did not object. Nor did he object to any later polygraph testimony from Livingston. It appears that whatever discussion occurred between defense counsel and the prosecutor off the record caused defense counsel to abandon his challenge to the polygraph evidence.

Instead, defense counsel opted to inquire further about polygraph testing, eliciting testimony from Livingston that Shade initially reached out to law enforcement and offered to take the test, Shade later refused the test based on his attorney's advice, and the reasons his attorney advised him not to take the test. Defense counsel also elicited testimony from Livingston that she was focused on helping the prosecution and "wasn't worried about what would help" Shade. Because the record in this case clearly reflects that defense counsel consciously chose not to challenge the polygraph evidence, and instead employed the strategy of *eliciting* polygraph testimony designed to benefit Shade, plain error review of any claim that the evidence was erroneously admitted has been waived. *See Rios*, 314 S.W.3d at 425 (finding the defendant waived plain error review where he did not object to, or seek relief from, the polygraph testimony, "opting instead to employ the strategy of converting the [evidence] into an opportunity to highlight [the defendant's] cooperation with all requests of him made by the police").

28

However, even if we were to review this claim for plain error, we would not reverse. Although polygraph evidence—including a defendant's offer or refusal to take a polygraph—is inadmissible, *State ex rel. Kemper v. Vincent*, 191 S.W.3d 45, 49 (Mo. banc 2006), the admission of such evidence does not warrant reversal where the defendant has not demonstrated prejudice, *State v. Woods*, 639 S.W.2d 818, 820 (Mo. 1982) (holding that while evidence showing "polygraph tests have or have not been taken" is inadmissible, it "is not necessarily prejudicial," and finding "no manifest injustice or miscarriage of justice requiring reversal" resulted from the admission of such evidence). Here, there was no manifest injustice or miscarriage of justice resulting from the admission of the polygraph evidence. The jury heard evidence that Shade refused to take a polygraph test, and nonetheless acquitted him of raping M.S. and sexually abusing B.F. The jury thus credited Shade's testimony denying he committed these offenses, demonstrating the polygraph evidence did not detrimentally impact the jury's credibility assessment of Shade.

Moreover, as previously chronicled in this opinion, there was ample evidence that was significantly more damaging to Shade than the evidence that he offered to take—and then refused to take—a polygraph test, including his DNA being found on M.S.'s breast and genitals, the abrasion on M.S.'s genitals that was consistent with sexual assault, the testimony of numerous individuals that M.S. reported being sexually abused, that Shade was the only man at Macon Health that matched the description given by M.S., and that M.S. later identified Shade as her assailant in a photo lineup. *See State v. Baldwin*, 808 S.W.2d 384, 392 (Mo. App. S.D. 1991) (rejecting the defendant's claim that she was prejudiced from the polygraph evidence: "Even if the jury inferred the result of the polygraph examination was unfavorable to defendant, there was evidence far more significant than that on whether [the victim's] death was accidental.").

Point IV is denied.

## Conclusion

The judgment of the trial court is affirmed.

_____
EDWARD R. ARDINI, JR., JUDGE

All concur.

30